RAYMOND H. STENDER, Plaintiff-Appellant, *v.* NATIONAL BOULEVARD BANK OF CHICAGO *et al.*, Defendants-Appellees.

First District (1st Division)   No. 82-0491

Opinion filed May 16, 1983.

Feiwell, Galper & Lasky, Ltd., of Chicago (George S. Feiwell, Michael A. Braun, and Bernard L. Rivkin, of counsel), for appellant.

Kevin M. Forde, Ltd., and Richard J. Prendergast, Ltd., both of Chicago (Kevin M. Forde, Richard J. Prendergast, and Katrina Veerhusen, of counsel), for appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

This is an appeal by plaintiff, Raymond H. Stender, from the trial court's order granting judgment in favor of defendants and dismissing the complaint. Plaintiff sued defendants for specific performance of

an alleged contract to purchase an apartment complex. Legal title to the property was held in trusts by defendant banks, National Boulevard Bank of Chicago and Pullman Bank and Trust Company, as trustees. The beneficiary of those trusts was a partnership of which the two individual defendants, D. F. Antonelli, Jr., and William G. Barr, are the general partners.

On February 9, 1981, plaintiff submitted a signed draft of a proposed contract for sale of property known as the Prentiss Creek Apartments in Downers Grove, Illinois. This proposed contract, consisting of a form contract, rider and joinder provision, was the third draft resulting from extensive telephone conversations and a previous meeting between the parties and their representatives. An addendum was also drafted by the parties.

The proposed contract was signed by plaintiff "as nominee for a trust to be formed." A certified check for $200,000 was also tendered as earnest money. This check was provided by Walton Realty, a partnership of which plaintiff is a member. The proposed contract called for a purchase price of $15,400,000, with a closing date of April 1, 1981. At closing, a $1,400,000 down payment was to be made, with the remaining amount secured by a wrap-around mortgage. This wrap-around mortgage was to bear an interest rate of $7\frac{1}{4}\%$ per annum, payable monthly for 84 months. Also, three annual payments of $600,000 were to be made on the first three anniversary dates of the mortgage.

At the time of the offer, the property was encumbered by mortgages totaling $7,695,000. An agreed-upon escrowee was to receive the wrap-around mortgage payments and pay on the existing mortgages as they became due. A junior mortgage on the property, securing an indebtedness of $1,850,000, was held by Barclays/American Business Credit (successor to Aetna Business Credit, Inc.) (hereinafter referred to as Barclays). Under the terms of this mortgage, a sale or further encumbrance on the property could not be made without the prior written consent of Barclays.

During the February 9, 1981, meeting, defendant Antonelli signed the joinder, addendum and a letter of direction to the trustees. Defendant Barr signed those documents the next day in Miami, where he was on vacation. His attorney was present at the time and reviewed the documents beforehand.

On February 11, 1981, Paul Barile, a real estate broker involved in the transaction, took the proposed contract and letter of direction to the offices of each defendant bank. Neither bank, as trustee, would sign the contract because of an assignment of beneficial interest for

collateral purposes to Barclays.

Attorneys for plaintiff and defendant Antonelli agreed to extend the April 1, 1981, closing date to May 1, 1981, in an attempt to gain Barclays' approval of the proposed contract. A letter from plaintiff addressed to the banks and mailed to Antonelli's attorney on February 17, 1981, indicated plaintiff's willingness to the extension. This letter referred to the proposed contract as an offer and specifically referred to plaintiff's agreement to extend the time for "acceptance of said offer."

The parties continued their negotiating efforts to satisfy all conditions for the sale and meet the extended closing date. Through the remainder of February and March, the primary effort, however, was directed at obtaining Barclays' consent to the transaction. Barclays had imposed numerous conditions to their approval of the deal. At a meeting early in March 1981, defendant Antonelli agreed to Barclays' demand that two additional percentage points be paid on the loan. Another condition set forth by Barclays required an irrevocable letter of credit in the amount of the mortgage or a prohibition against foreclosure on the purchasers without first paying off the Barclays mortgage. Although most of the conditions set forth by Barclays were acceptable to defendants, this last condition was not.

A question also arose as to the status of the $200,000 earnest money. These funds were not earning any interest payable to the purchaser, as required by the proposed contract. The parties' attorneys discussed what steps to take in this regard. Unable to agree on the type of escrow agreement for the funds, Antonelli's attorney returned the certified check to plaintiff's attorney.

Further negotiations to settle all the conditions of the deal failed. Defendants suggested a transfer of the property by articles of agreement so as to eliminate the need for Barclays' consent. This suggestion was rejected by plaintiff and his counsel. A dispute existed over the disposition of a lease to an independent party (Presidential Villas, Inc.) of a portion of the apartment complex. Additionally, the parties never agreed on an engineer's report containing cost estimates for the repair and replacement of roof areas and mechanical or structural systems in the buildings. Finally, the wrap-around mortgage was never drafted and agreed upon by the parties.

As a result, the transaction did not take place on the extended May 1, 1981, closing date. Further talks proved fruitless. In early June 1981, it was learned defendants had entered a contract to sell the Prentiss Creek Apartments to another purchaser.

On June 4, 1981, plaintiff filed his complaint seeking specific per-

formance of the alleged contract with defendants. On February 22, 1982, trial in this matter began. During the trial, plaintiff attempted to introduce evidence pertaining to the negotiations of the parties prior to the February 9, 1981, proposed contract. The trial court sustained defendants' objections to all evidence of events occurring before that date. Plaintiff was also barred from introducing evidence of the subsequent agreement for the sale of the property entered into between defendants and another purchaser. Plaintiff submitted an offer of proof to the court relevant to these matters.

At the close of plaintiff's case in chief, defendants moved for judgment in their favor. The trial court entered judgment for defendants and dismissed the complaint (see Ill. Rev. Stat. 1981, ch. 110, par. 2—1110), finding that plaintiff was not entitled to specific performance. The court further found that plaintiff did not prove the elements needed for a binding contract to exist between the parties. The court specifically found the proposed contract "too indefinite to support either an action in equity for specific performance or at law for breach of contract and money damages."

On appeal, plaintiff contends (1) the trial court erred in not granting specific performance; (2) error occurred in finding the contract was not binding between the parties; and (3) the trial court erred when it excluded evidence pertaining to the formation of the contract and the existence of a subsequent agreement with third parties for the sale of the property.

Prior to oral arguments in this matter, defendants filed a motion to dismiss this appeal on grounds of mootness. We took this motion with the case and address ourselves first to this question.

Defendants' mootness argument is based on the claim that title to the Prentiss Creek Apartments has been conveyed to another purchaser. Defendants note that plaintiff's notice of appeal was filed on March 1, 1982. A stay of the judgment pending appeal was not sought by plaintiff. Defendants argue then that the sale of the apartment complex to a third party places the property beyond the reach of plaintiff regardless of the outcome of the appeal. See 87 Ill. 2d R. 305(i); *Horvath v. Loesch* (1980), 87 Ill. App. 3d 615, 410 N.E.2d 154; *Avondale Savings & Loan Association v. Amalgamated Trust & Savings Bank* (1979), 78 Ill. App. 3d 244, 397 N.E.2d 121, *appeal denied* (1980), 79 Ill. 2d 625.

Plaintiff counters with two arguments. In objecting to the motion to dismiss, it is argued that Rule 305(i) is inapplicable to this case because the third-party purchaser acquired an interest in the property prior to the final judgment when it executed a contract on May 28,

1981. Secondly, plaintiff argues that his right to a determination of damages is not moot.

This is not the first time the issue of plaintiff's remedy has arisen. In the trial court, defendants attempted to strike plaintiff's prayer for specific performance, arguing that there was an adequate remedy at law. Plaintiff's complaint did not alternatively seek money damages nor was it ever amended to include such a remedy. Plaintiff maintained at trial and also on appeal that the prayer for general relief allows the trial court to grant any relief to which he may be entitled, including money damages.

It has been said that the prayer for general relief "is the best prayer next to the Lord's prayer" (see *VanZanten v. VanZanten* (1915), 269 Ill. 491, 497, 109 N.E. 986); but, rather than determine the question of mootness, we prefer to dispose of this appeal on the merits.

■ At the close of plaintiff's case in chief, a defendant may move for a finding or judgment in his favor. (Ill. Rev. Stat. 1981, ch. 110, par. 2—1110.) When ruling on such a motion, the trial court must weigh all the evidence, including any favorable to the defendant, pass on the credibility of witnesses, draw reasonable inferences from the testimony, and generally consider the weight and quality of the evidence. *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43.

■ A two-step analysis should be used by the trial court when ruling on a section 1110 motion. (*Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154-55.) First, it must be determined whether a *prima facie* case has been presented. If so, the court should then weigh the evidence to determine if a *prima facie* case still exists. (*Chicago Title & Trust Co. v. Ceco Corp.* (1980), 92 Ill. App. 3d 58, 415 N.E.2d 668.) On appeal, the decision of the trial court should not be reversed unless it is contrary to the manifest weight of the evidence. *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154; *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 349 N.E.2d 399.

■ Specific performance of a contract is not to be accorded as a matter of right, but the awarding of such relief rests in the sound discretion of the trial court, whose decision will not be upset absent an abuse of discretion, or unless his action is contrary to the manifest weight of the evidence. (*Mearida v. Murphy* (1982), 106 Ill. App. 3d 705, 435 N.E.2d 1352; *Kukulski v. Bolda* (1953), 2 Ill. 2d 11, 116 N.E.2d 384; *Johnson v. Gianacakos* (1934), 356 Ill. 410, 190 N.E. 691.) Specific performance will not be granted unless the terms of the contract are sufficiently certain for the court to decree with some exactness what the defendant must do. 11 Williston, Contracts sec. 1424

(3d ed. 1968).

In the case at bar, the trial court found the alleged contract was not so certain, complete and unambiguous as to permit specific performance. In making its decision, it found (1) there was no agreement on the cost of repair and maintenance; (2) the parties had not agreed on the credit to be given seller as to a portion of the complex which was leased to Presidential Villas, Inc.; and (3) the wrap-around mortgage was not negotiated, drafted and agreed upon by the parties. Implicit throughout the court's ruling is the belief that the court would necessarily be involved in supervision of the contract if specific performance were allowed. Plaintiff contends these findings were against the manifest weight of the evidence. We disagree.

Paragraph 17 of the rider to the contract gave plaintiff, as a condition precedent to closing, the right to inspect the apartment complex with the sellers in order to determine what repairs and/or replacements were required to the roofs and mechanical or structural systems of the buildings. This study was to occur within 30 days of the contract date. The addendum drafted at the February 9, 1981, meeting provided that either party would have the right to terminate the agreement unless plaintiff agreed to pay the costs of repairs and replacement over $100,000. Also, if the parties could not agree on certain repair or replacement work, paragraph 17 provided that a third-party engineer was to resolve the dispute.

The record reveals such a mutual cost study never occurred. Plaintiff's engineer, Robert Mustari, testified that he made several on-site inspections to determine what deferred maintenance costs would be needed for the complex over a two to five year period. Plaintiff also testified that he never gave Mustari specific instructions for his inspections. Plaintiff stated he needed to know the cost figure on deferred maintenance for a limited partnership prospectus.

Plaintiff argues that by filing suit he has waived the benefit of paragraph 17. (See *National Super Markets, Inc. v. First National Bank* (1979), 72 Ill. App. 3d 221, 390 N.E.2d 602.) In *National Super Markets*, this court noted that specific performance need not be barred where a contingency is in effect if the purchaser has, in effect, waived it. (72 Ill. App. 3d 221, 229.) The contingency in that case was for the benefit and protection of the purchaser. The case before us differs in that paragraph 17 and the addendum provision provide protection to both parties. Defendants must bear the costs of repairs and replacements up to $100,000. If the plaintiff refused to bear all excess costs, defendants had the right to terminate the agreement. The trial court's findings in this respect are supported by the manifest weight

of the evidence.

A portion of the apartment complex was leased to Presidential Villas, Inc., which rented the units to individual tenants. Defendants had the burden of settling with Presidential Villas, Inc., the various terms of that lease, particularly whether an option would be exercised. The addendum provided defendants were to bear all loss of income and increased expenses to plaintiff resulting from below market rental rates, improper notice of intent to exercise the option and decorating and cleaning costs incurred more than once a year.

The trial court cited the lack of agreement as to credit from defendants to plaintiff as too indefinite. Specifically, the court noted that a definition of "below market rates" had not been made. The record shows that no definition of this term was agreed to by the parties.

The rider to the contract contemplated the purchase price and method of payment on the transaction. Payments were to be made under a wrap-around mortgage and a series of three payments of principal during the first three years. The wrap-around mortgage instrument was never drafted and agreed upon by the parties. Nevertheless, plaintiff argues that all the terms necessary for a binding contract are present in the rider, citing *Hux v. Raben* (1966), 74 Ill. App. 2d 214, 219 N.E.2d 770, *affirmed* (1967), 38 Ill. 2d 223, and *Chicago Investment Corp. v. Dolins* (1981), 93 Ill. App. 3d 971, 418 N.E.2d 59.

The trial court found that the mortgage document was essential to the undertaking of the transaction and many items remained open for negotiation. The testimony of Norman Codo, an attorney for defendant Barr, reveals that the essential terms of a default provision had yet to be determined. Codo also stated the type of service for the underlying first and second mortgages made by the holders of the wrap-around mortgage, along with acceleration clauses, were subject to negotiation by the parties. It is clear that this testimony was determined to be credible and convincing by the trial court.

The trial court also refused to grant specific performance to plaintiff because it did not have jurisdiction over Barclays. Barclays had the power to transfer title through an assignment of beneficial interest held as collateral for the mortgage to Barr. Paragraph 11 of the rider to the contract provided that the obligations of the parties were contingent on the consent of the mortgage holders. Thus, the approval of Barclays was needed for the transaction to occur.

Plaintiff argues that defendants were obligated to obtain Barclays' consent to the sale. Plaintiff also argues that this obligation included assenting to and performing the conditions imposed by Bar-

clays. We disagree.

■ Where the performance of a contingency or condition is within the control of a party to an agreement, the party for whose benefit the condition precedent runs is required to use "reasonable efforts" to have it occur. (*Dodson v. Nink* (1979), 72 Ill. App. 3d 59, 390 N.E.2d 546; *Smith v. Vernon* (1972), 6 Ill. App. 3d 434, 286 N.E.2d 99, *appeal denied* (1972), 52 Ill. 2d 599.) Barclays' consent to the transaction was made only upon defendants' acceptance of several conditions. One condition made by Barclays required a letter of credit in the amount of the mortgage or, alternatively, a prohibition against foreclosure on the purchaser without a payoff first being made on the Barclays mortgage. This condition was unacceptable to defendants. Although defendants were willing to accept some of the conditions, they were not obligated to accept and perform the conditions made by Barclays.

On appeal, plaintiff has sought review of the trial court's determination that there was not a binding contract between the parties. He contends that a reversal of that determination by this court will entitle him to a hearing on the damages issue. The trial court specifically found that the alleged contract did not support an action for breach of contract and money damages.

A review of the record and the trial court's findings shows plaintiff is not entitled to damages. The same reasons for denying plaintiff specific performance also support the denial of damages.

■ In making this determination, the trial court further found that the alleged contract lacked mutuality. This finding is borne out by examination of paragraph 11 of the rider to the contract. Paragraph 11 allows plaintiff to approve or disapprove of the documents relating to the mortgages on the property. If plaintiff disapproved, the contract could be canceled "in his sole discretion." A similar clause in a letter of intent resulted in the dismissal of a purchaser's action for breach of contract in *Gardiakos v. Vanguard Communications, Inc.* (1976), 38 Ill. App. 3d 937, 350 N.E.2d 210. In that case the court stated that "[m]utuality of obligation is lacking, and neither party is bound to an executory contract where one of the parties has the right to arbitrarily terminate it." 38 Ill. App. 3d 937, 939.

Several other factors also contributed to the trial court's finding that the alleged contract was not enforceable. Plaintiff submitted his proposed contract signed by himself as "nominee for a trust to be formed." The trust was never formed. There were no commitments from potential investors or financial institutions to finance the purchase. Plaintiff's attorney testified that plaintiff never intended to as-

sume any personal liability under the proposed contract.

The conduct of the parties after plaintiff submitted the proposed agreement belies the existence of a contract for sale. The record indicates, as the court found, that plaintiff referred to the proposed agreement as an offer. In a letter to the bank trustees dated February 17, 1981, plaintiff "agreed to extend time for seller's acceptance." This letter also referred to the offer made by plaintiff. The proposed agreement refers to itself as an offer to purchase, with executed copies to be returned to plaintiff. Also, the earnest money originally tendered with the proposed agreement was returned to plaintiff as negotiations continued and the projected closing date was delayed.

■ Plaintiff also argues the trial court erred when it excluded evidence relating to the conversations, prior drafts and related documents, and to the actions taken by the parties prior to the date plaintiff submitted his proposed agreement, February 9, 1981. It is well settled that if a written contract between parties is clear and the language unequivocal, then parol evidence may not be received to explain or expand upon its terms. (*Gardiakos v. Vanguard Communications, Inc.*; see *Farmers & Mechanics Bank v. Davies* (1981), 97 Ill. App. 3d 195, 422 N.E.2d 864.) Plaintiff's position throughout the presentation of his case was that a binding agreement expressing the intent of the parties existed which was enforceable by the parties. Plaintiff's reliance on *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683, and *Inland Real Estate Corp. v. Christoph* (1981), 107 Ill. App. 3d 183, 437 N.E.2d 658, is misplaced. In those cases the respective courts applied the general rules of construction, recognizing the exception to the parol evidence rule after determining there was ambiguity or inconsistency in the litigated contracts.

The decision of the trial court is not against the manifest weight of the evidence. Accordingly, the decision of the circuit court of Cook County granting judgment to defendants and dismissing plaintiff's complaint is affirmed.

Affirmed.

GOLDBERG and CAMPBELL, JJ., concur.