MAXWELL FIELDS *et al.*, Plaintiffs-Appellants and Counterdefendants-Cross-Appellees, *v.* SAMUEL W. SAX *et al.*, Defendants-Appellees and Counterplaintiffs-Cross-Appellants.

First District (4th Division)   No. 83—1040

Opinion filed April 12, 1984.

Russell J. Topper, Edward Berman, and Hoffman & Davis, P.C., all of Chicago, for appellants.

Selwyn Zun and Robert W. Gettleman, both of D'Ancona & Pflaum, of Chicago, for appellees Exchange National Bank of Chicago and Exchange International Corporation.

Kevin M. Forde, of Kevin M. Forde, Ltd., R. A. Mantynband, of Arvey, Hodes, Costello & Burman, N. J. Motherway, of Motherway & Glenn, and Richard J. Prendergast, Ltd., all of Chicago, for other appellees.

JUSTICE O'CONNOR delivered the opinion of the court:

This appeal arises from the granting of defendants' motion for judgment at the close of plaintiffs' case. (Ill. Rev. Stat. 1981, ch. 110, par. 2—1110.) The cause of action, a derivative suit by shareholders of Exchange National Bank, was originally filed in 1970. The defendants, George Sax, Samuel Sax, Samuel Bergman, Melvin Lippe and Walter Hepner, were directors of the nominal defendant, Exchange National Bank. George Sax was the chairman of the board of directors until his death in 1974, and Samuel Sax was the president of the bank. Jerome Sax was the nominal plaintiff in the original action, which also included several personal claims. These latter claims are not part of this appeal.

In *Sax v. Sax* (1977), 48 Ill. App. 3d 431, 363 N.E.2d 16, this court upheld, on equity grounds, a trial court determination that Jerome Sax was an improper plaintiff to prosecute the derivative action. The trial court's order was modified, however, to require notice be given to the other shareholders of record so that they be given the opportunity to carry on the litigation. After successfully intervening in this cause, plaintiffs filed their amended derivative action. The basic claims made in the amended action remained the same: (see 48 Ill. App. 3d 431, 432-33)

1. Defendant paid excess fees, salaries and expenses to George Sax from 1969 to his death in 1974 when he was too ill

due to heart disease to perform his duties.

2. Bank funds were misapplied in settlement of the claims of the receivers of American Allied Insurance Company, Bell Mutual Casualty Company and Bell Casualty Company. These claims arose out of certain loan transactions between the bank and Philip Kitzer, Jr. (Kitzer transactions).

3. An improper and illegal loan was made to George Liederman. This loan was allegedly increased periodically without the collection of interest or principal.

4. A loan was made to Marvin Hornstein, a nephew of George Sax, which was illegal, excessive and improperly made with the knowledge that repayment could not be made.

Plaintiffs presented their case in chief over 13 days of trial. The evidence will be discussed as it related to the various issues on appeal. The allegations relating to the Hornstein loan were withdrawn.

Upon defendants' motion, and after considering arguments from all the parties, the trial court entered judgment for defendants on each claim. The trial court found that George Sax performed important services to the bank as chairman of the board despite suffering from "periods of acute illness" and that no funds were improperly paid to him. It was further determined that plaintiffs had not proved that defendants violated the National Bank Act (12 U.S.C. sec. 21 *et seq.* (1976)) or the bank's lending procedure with regard to the alleged illegal loans. The trial court also found there was no proof that any defendants participated in the Kitzer transactions. The settlement of the litigation arising out of those transactions was determined to be "a prudent exercise of directional discretion and judgment." For similar reasons, the Liederman loan, of which approximately 86% of the balance was collected, was found to have been properly settled.

Plaintiffs appeal contending: (1) the trial court's judgment for defendants was improper; (2) defendants have the burden of proving they did not act in their own self-interest during the alleged transactions; and (3) the evidence at trial showed funds were misappropriated in paying George Sax for services that were never performed and in settling fraudulent loan transactions. We affirm.

The controlling issue is whether judgment in defendants' favor at the close of plaintiffs' case in chief was correct. When ruling on a motion under section 2—1110 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1110), the trial court must weigh all the evidence, including any favorable to the defendant, pass on the credibility of witnesses, draw reasonable inferences from the testimony, and generally consider the weight and quality of the evidence. (*Ko-*

*kinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43; *Stender v. National Boulevard Bank* (1983), 114 Ill. App. 3d 1041, 449 N.E.2d 873, *appeal denied* (1983), 96 Ill. 2d 551.) The trial court should apply a two-step analysis when ruling on the motion, determining first whether a *prima facie* case has been presented, and if so, weighing the evidence to determine if a *prima facie* case still exists. (*Kokinis v. Kotrich; Chicago Title & Trust Co. v. Ceco Corp* (1980), 92 Ill. App. 3d 58, 415 N.E.2d 668.) The trial court's decision will not be reversed unless it is contrary to the manifest weight of the evidence. *Kokinis v. Kotrich.*

Plaintiffs state that defendants, as directors, bear the burden of proof as fiduciaries. (*Briggs v. Spaulding* (1891), 141 U.S. 132, 35 L. Ed. 662, 11 S. Ct. 924; *Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 166 N.E.2d 793.) It is contended that under this burden defendants must prove the fairness of each and every act beyond a shadow of suspicion. *Karris v. Water Tower Trust & Savings Bank* (1979), 72 Ill. App. 3d 339, 389 N.E.2d 1359; *Majewski v. Gallina* (1959), 17 Ill. 2d 92, 160 N.E.2d 783.

■ We agree with plaintiffs' assertion that defendants, as directors, stood in a fiduciary relationship with the bank and its shareholders. However, plaintiffs misapprehend the applicability of these basic tenets to the case at hand. The party asserting a fiduciary relationship, and a breach thereof, "must also affirmatively show that [the defendant] was the dominant party and that it gained" from the transaction. (*Brown v. Commercial National Bank* (1968), 94 Ill. App. 2d 273, 279, 237 N.E.2d 567, *aff'd* (1969), 42 Ill. 2d 365, 247 N.E.2d 894, *cert. denied* (1969), 396 U.S. 961, 24 L. Ed. 2d 425, 90 S. Ct. 436.) This rule of law was applied in *Karris* where it was determined the plaintiff failed to show that the bank directors profited from the transactions at issue. 72 Ill. App. 3d 339, 354.

Plaintiffs further rely on *Santarelli v. Katz* (7th Cir. 1959), 270 F.2d 762, to place the burden of proof on defendants. In that case, executive compensation in a family-owned corporation was determined by the executives who were acting in their capacity as directors. The defendant-executives had to meet the burden of proving the fairness of the compensation paid to themselves as officers and directors. Plaintiffs in this case neither alleged nor established that George Sax participated in any board decisions relating to his compensation.

■ Plaintiffs allege the wrongful payment of compensation to George Sax and the wrongful settlement of the Kitzer transactions and Liederman loan. Directors must exercise that degree of care and prudence that men prompted by self-interest exercise in the manage-

ment of their own affairs. (*Romanik v. Lurie Home Supply Center, Inc.* (1982), 105 Ill. App. 3d 1118, 435 N.E.2d 712.) A corporate director will not be held liable for honest errors or mistakes of judgment as long as the decision does not involve fraud, illegality or conflict of interest. (See *Lower v. Lanark Mutual Fire Insurance Co.* (1983), 114 Ill. App. 3d 462, 448 N.E.2d 940; *Romanik v. Lurie Home Supply Center*; 3A W. Fletcher, Cyclopedia of the Law of Private Corporations secs. 1039-40 (rev. perm. ed 1975.) Further, where the acts complained of are corporate decisions which fall within the purview of the business judgment rule, this court is without authority to substitute its judgment for the lawful decisions of the directors. See *Shlensky v. Wrigley* (1968), 95 Ill. App. 2d 173, 237 N.E.2d 776, *appeal denied* (1968), 39 Ill. 2d 627; *Geeslin v. Blackhawk Heating & Plumbing Co.* (1979), 80 Ill. App. 3d 179, 398 N.E.2d 1176.

Plaintiffs allege that bank funds used to pay George Sax' salary, director's fees and other expenses during the last six years of his life were misappropriated. The crux of this allegation is that George Sax was physically disabled and could not perform the services required of his position as chairman of the board. Plaintiffs also argue that George Sax was past the retirement age of 65 in 1969 and should have been forbidden to serve as chairman.

The evidence shows that George Sax suffered from organic heart disease for 12 years before he died of heart failure in 1974. He had two heart attacks and continued to suffer from coronary arteriosclerosis during the latter years of his life. George Sax took daily doses of medication for these and related illnesses. During the five-year period from 1969 to 1974 George Sax was hospitalized for 251 days. He also maintained an apartment in Florida where he lived for approximately three months a year.

Admittedly, George Sax was a very sick man and was described as such in the record by the doctors who treated him. He was also described by these doctors as being mentally alert and very capable despite the physical ailments. When hospitalized at the Miami Heart Institute George Sax conducted business on the telephone and received materials from the bank. His doctor at the Institute described himself as being annoyed that George Sax would spend so much time on the telephone.

Further evidence in the record reveals George Sax' activities on behalf of the bank during the last years of his life. George Sax was involved primarily in the bank's policy-making functions rather than the day-to-day management and administration of the banking business. When he was out of town, George Sax received briefings on

bank activities during daily telephone calls. He also received daily mailings which included data on the bank's deposits, new business and special problems.

Examples of George Sax' contributions to the bank during this time included the plan to form a bank holding company which would allow the bank to obtain certain funds free from Federal regulations on interest rates. Meetings of the board of directors relating to this plan took place both at the bank and at George Sax' apartment in Florida. He also participated in the planning of foreign branch banks in the Bahamas and Israel in order to increase the scope of the bank's international business. George Sax personally attended and presided over the opening ceremonies of the branch in Israel. He further worked on plans for the creation of other foreign representative offices in Frankfurt and Mexico City.

A stipulation at trial showed George Sax was paid a total salary of $643,072.50 from 1969 to April 1974 and that he also received director's fees totaling $19,000 during the same period. As to the latter sum we are mindful of the fact that George Sax did not attend 67 of 73 directors meetings during this period. Plaintiffs appear to assume this absence established a liability on their claim. As discussed above, it is obvious that George Sax continued to play a vital role in bank policy-making decisions during the last five years of his life. The trial court's findings are supported by the record in this respect.

■ Plaintiffs accurately state that a director has a duty to attend and participate in the regular meetings of the board of directors. (See *Bowerman v. Hamner* (1919), 250 U.S. 504, 63 L. Ed. 1113, 39 S. Ct. 549.) It has also been said that "[i]nvalids are permitted to indulge in the hope of recovery, and are not called upon by reason of illness to retire at once from the affairs of this world and confine themselves to preparation for their passage into another." (*Briggs v. Spaulding* (1891), 141 U.S. 132, 155, 35 L. Ed. 662, 671, 11 S. Ct. 924, 932.) Although we have concluded that George Sax far from withdrew from the business affairs of the bank, it is equally evident that his periodic illnesses and trips to Florida inhibited his attendance at the board meetings. The payment of compensation to ill employees is a matter of business practice and judgment of the board of directors. (*Bermann v. Meth* (1969), 436 Pa. 88, 93, 258 A.2d 521, 523, citing *Solimine v. Hollander* (1940), 128 N.J. Eq. 228, 16 A.2d 203; see Annot., 53 A.L.R.3d 358 (1973).) The minutes of the annual directors meetings reveal that George Sax was not singled out for preferential treatment in this respect. The board's resolution called for payment of director's fees whether a director "does or does not attend the meeting." It is

466

apparent the board of directors, in its considered judgment, believed this compensation to be fair. The trial court determined the overall compensation paid to George Sax was justified. This finding, and the judgment against plaintiffs on this issue, is supported by the record.

Plaintiffs' next argument focuses on a series of loan transactions nebulously termed the Kitzer transactions. From 1961 to 1965, several bank officers engaged in certain loan transactions with Philip Kitzer and Philip Kitzer, Jr. As a result of these transactions the Kitzers were able to gain false certification that their newly formed insurance company had adequate reserve deposits. Further transactions arranged loans and transferred collateral between accounts, giving the appearance of financial integrity. Consequently, the bank became involved in two lawsuits with the receivers for the Kitzer companies. Plaintiffs called as a witness, Selwyn Zun, the bank's attorney of record in this case and the attorney who conducted the Kitzer litigation. During that time he investigated the loan transactions. He found the documentation of the transactions to be proper in the absence of knowledge of the fraudulent conduct.

The bank settled the two lawsuits against it; one, with the approval of the bank's bonding carriers. In that case, the bank recovered 75% of its liability; in the other, approximately 66% of its liability. The bank did not attempt to recover from the bank officers involved in the loan transactions because, as Zun testified, the insurers were subrogated to the bank's rights, the officers were apparently judgment-proof and the bank desired to limit further publicity on the matter.

Plaintiffs contend the defendants should have discovered the loan transaction scheme. It is also contended that the bank wrongfully settled the lawsuits against it. There is no evidence in the record to support these contentions. There is nothing to suggest defendants actually took part in the transactions. Nor is there evidence to suggest defendants, as directors, should have detected these transactions. The acts complained of were engaged in by, at the time, trusted officers of the bank. One of these men, the original plaintiff in this case (see *Sax v. Sax*), was an executive vice-president, a member of the officers' loan committee and a director of the bank.

The loans involved in these transactions were disbursed by the lending officers. Several of these loans were repaid within a short period of time. All loans were reviewed by the officers' and directors' loan committees pursuant to the bank bylaws. Bank directors are not insurers of the fidelity of the corporate agents and cannot be held responsible for losses resulting from the wrongful acts of other direc-

tors or agents unless they neglect to properly supervise the business. (*Briggs v. Spaulding* (1891), 141 U.S. 132, 147, 35 L. Ed. 662, 668-69, 11 S. Ct. 924, 929; *Becker v. Billings* (1922), 304 Ill. 190, 136 N.E. 581.) Plaintiffs' evidence has failed to connect any negligent acts of defendants to the Kitzer transactions.

In 1964, George Liederman borrowed money from the bank to finance the renovation of an apartment building. This loan was extended at various times from 1965 to 1970. A memorandum of the bank's credit department contained in the record indicates the original extension was based on Liederman's net worth of $3.5 million and his annual income of $250,000. Liederman's wife had also guaranteed the note. Liederman died in 1971, leaving an unpaid balance of $673,268.28 of which $596,000 was principal. A claim in the probate proceedings was filed when the estate was opened. In 1975, after a complaint was filed in circuit court, Liederman's wife paid $199,934. The balance due from the estate was settled for all but $94,720.28. Thus, the bank recovered 86% of the amount due at Liederman's death.

■ Again, plaintiffs' evidence does not reveal any negligence or wrongdoing on the part of defendants in respect to the Liederman loan. The cases cited by plaintiffs are inapplicable to the facts of this case. (*E.g., Atherton v. Anderson* (6th Cir. 1938), 99 F.2d 883 (self-dealing by president of bank); *Ringeon v. Albinson* (D. Minn. 1929), 35 F.2d 753 (bank officers looted the bank through self-interested transactions).) The evidence does not indicate that the loan to Liederman was excessive in light of his net worth. *First National Bank v. Keller* (N.D. Ill. 1970), 318 F. Supp. 339, 348.

Absent evidence of bad faith, fraud, illegality, or gross overreaching, courts are not at liberty to interfere with the exercise of business judgment by corporate directors. (*Panter v. Marshall Field & Co.* (7th Cir. 1981), 646 F.2d 271; *Lower v. Lanark Mutual Fire Insurance Co.* (1983), 114 Ill. App. 3d 462, 448 N.E.2d 940.) There is nothing in the record in this case to suggest anything other than the proper exercise of business judgment by the bank directors. The findings of the trial court are supported by the record.

Accordingly, the judgment of the circuit court of Cook County granting judgment to defendants and dismissing plaintiffs' complaint is affirmed.

Affirmed.

ROMITI and JOHNSON, JJ., concur.