CHESTER BORYS *et al.*, Plaintiffs and Counterdefendants-Appellees, v. WILLIAM RUDD, Defendant and Counterplaintiff-Appellant.

First District (1st Division)   No. 1—89—3038

Opinion filed December 10, 1990.—Rehearing denied February 4, 1991.—Modified opinion filed February 11, 1991.

Jenner & Block, of Chicago (Russell J. Hoover, of counsel), for appellant.

Brown & Statza, of Chicago (Gerald R. Statza, of counsel), for appellees.

JUSTICE BUCKLEY delivered the opinion of the court:

This appeal arises from the accounting of the affairs of the dissolved Orland Humphrey Building Partnership (the partnership). Litigation commenced in 1987 when two of the partners, Chester Borys and Robert Scurio (plaintiffs), brought suit in the circuit court of Cook County against the third partner, William Rudd (defendant), seeking to enjoin defendant from acting as the sole manager of the partnership and seeking an accounting of the partnership business. The circuit court entered an injunctive order providing that all three partners manage the property equally by vote commencing January 1988, but the partnership dissolved shortly after the effective date. The circuit court then entered an agreed order requiring defendant to account for the partnership operations from its inception through January 1988 and requiring plaintiffs to account for the period after January 1988. The parties also filed independent claims, alleging breaches of contract and fiduciary duty.

Following a bench trial, the circuit court entered an order distributing the partnership's assets. Defendant appeals from those portions of the order requiring defendant to pay rent to the partnership for use of the building's basement space, requiring defendant to pay real estate tax penalties and losses resulting from the settlement of a partnership claim, refusing defendant any interest on cash advances to the partnership, refusing defendant compensation for management and janitorial services, and ordering plaintiffs' attorney fees be paid from the partnership assets.

In 1978, defendant requested that plaintiffs, his long-time friends and business acquaintances, become his partners in the construction and operation of an office building in Orland Park, Illinois. Plaintiffs and defendant orally agreed to the partnership, each agreeing to make a $50,000 capital contribution to the venture and that any additional cash advances loaned to the partnership would earn interest at the rate of 2% over the prime rate.

On August 4, 1979, the three partners entered into a written agreement with Rudd, who signed in his individual capacity. The agreement provided, in pertinent part:

> "Be it resolved that the partnership has undertaken to construct a three story office building in Orland Park for the purposes of securing rental income with the eventuality of spliting [*sic*] off parts as condo office space, wherein the partnership will continue to hold that portion of condominium office space that they desire for income purposes. In consideration for William A. Rudd's conception of the idea of the office building and

for his efforts in procuring a suitable site for the building and his work and efforts in getting the office building constructed, the partnership has agreed to sell to William A. Rudd the basement at whatever additional cost was incurred to construct the basement. Additional cost is defined as that cost incurred by the partnership over and above what cost that would have been incurred anyway to build and occupy the three story office building.

Be it resolved that the partnership will enter into a lease with William Rudd so that the bank's requirements for lease activity shall be satisfied and the amounts that will be payed [sic] under the lease arrangement will be only to the extent of paying for the cost listed above. Since the building will be mortgaged as an entire unit William Rudd will pay that portion that reflects his cost of the basement principal and interest and the partnership will pay the balance. *** Heat and light is to be separately metered and will be the expense of William Rudd for that portion which is his, the basement. Also pro rata re [sic] taxes, water.

* * *

William Rudd will furnish a management service for the building and will charge a fee based on the going market rate as determined by the average of Arthur Rubloff and Baird Warner for similar services. Janitorial services will be provided by personnel hired by William Rudd and on the payroll of Comprehensive Accounting and the partnership will be charged the going rate for janitorial services.

William Rudd will provide an accounting service at a rate consistent with that charge [sic] to other clients for similar services."

On the same date, the parties also entered into an agreement establishing a land trust to hold title to the real estate at the Bank of Hickory Hills. Each partner originally held an undivided one-third beneficial interest in the land trust, with the agreement later being amended to provide that the partnership own the entire beneficial interest.

Through defendant's efforts in finding a suitable construction site, in securing financing, in making arrangements for building construction, and in gaining the appropriate municipal approval, the partnership acquired the real estate at a cost of $150,000 and, by October 1980, completed construction on the three-story office building with basement at a cost of approximately $625,000. The latter cost in-

cluded $82,096 for the additional cost of the basement construction and $10,445 for the cost of a telephone system installed in the basement.

Defendant moved his accounting business into the building's basement in October 1980. Defendant undertook operation and leasing management of the building, including drafting and negotiating leases, laying out and supervising tenant build-outs, dealing with tenant complaints, collecting rent and paying bills. Commencing in the fall of 1980, defendant leased the building's basement space for $2,000 per month to his corporation, Rudd, Inc., which, in turn, began subleasing a portion of the space in April 1987 to a tenant for $550 in monthly rent.

Defendant also maintained the partnership books and detailed accounting records. Defendant communicated with plaintiffs on a weekly basis during the period 1981 to 1986 regarding partnership and personal business. Defendant and plaintiffs disputed at trial whether defendant furnished written financial statements on an annual basis. Scurio admitted he received financial statements in 1981, 1984 and 1986 for the years 1981 through 1983 and the first six months in 1986, and Borys also admitted receiving statements for the years 1981 through 1983 and 1986.

The partnership did not show a profit until 1986, the first year the building was 100% rented. Defendant failed to file partnership income tax returns during the years the partnership operated at a loss, and he agreed to accept personal financial responsibility for the resulting annual late filing penalties of $750 assessed to the partnership. Defendant was unable to obtain any bank loans on behalf of the partnership, and the partnership's 1981-1982 and 1984 unpaid real estate taxes were sold. The taxes were ultimately redeemed—the penalties from which amounted to $67,747.98. Defendant settled the partnership's $15,000 disputed claim against the seller of the real estate, Terry Kunes, for $10,000. Defendant did not inform plaintiffs of the tax sales until 1987, and he did not obtain Scurio's or Borys' approval to settle the partnership claim.

In order to meet operating expenses, the partners advanced additional money to the venture. Promissory notes were given for most of the partners' loans. Defendant and Borys signed all but one of the Scurio notes on behalf of the partnership, and defendant signed his and Borys' notes on behalf of the partnership. Scurio's advances were also evidenced by a security agreement and assignment of beneficial interest recorded with the land trustee.

Defendant accounted for the partners' advances by establishing

three separate "notes payable to related parties" accounts. Interest accrued on the accounts at a rate of 2% over the prime rate. Defendant increased the account balances when advances were made by the partners, and he decreased the balances when payments were made by the partnership to the partners. By the time of dissolution in 1988, the net balance in the Scurio account was $88,500, while the Borys account reflected a $22,000 net balance. Defendant's account reflected actual cash advances totalling $322,810.90, unpaid charges to the partnership of $10,000 per year for his management services, and unpaid charges of $13,000 per year for janitorial services. Defendant deducted from his notes payable account his debt to the partnership for the basement space, prorating the partnership's annual mortgage principal and interest payments, real estate taxes, and gas and electric bills. At the time of trial, after reducing his account by more than $140,000 for principal and interest payments, $92,541 of the principal remained on defendant's debt to the partnership.[1]

The partnership sold the office building for $1.1 million prior to trial. As of the time of trial, the partnership's property available for distribution, after payment to third-party creditors, totalled $445,525.81. Although defendant's calculations reported $68,024 in Borys' note payable account, $213,918 in the Scurio account, and $607,389.56 in defendant's account,[2] the circuit court's order found $6,025.81 to be due to defendant on cash advanced, $29,919.29 due to Borys on cash advanced, $165,238.31 due to Scurio on cash advanced. The court deducted the following from the remaining $247,939.29 balance: $3,750 in escrow to insure payment of tax penalties, $3,596.89 to close partnership account at Hickory Hills Bank, $7,922.06 for accounting fees by the recent accountant, $36,002.30 in legal fees to plaintiffs' lawyers, and $50,000 in capital contributions to each of the partners. The court then divided the remaining balance into one-third distributions of $15,556.01. The court's calculations resulted in total payments of $230,794.33 to Scurio; $95,475.30 to Borys; and $71,581.82 to defendant.

On appeal, defendant contests, not the order of the circuit court's distribution of payment (see Ill. Rev. Stat. 1987, ch. 106½, par. 40(b)),

---

[1]In preparing his final accounting, defendant established a separate asset account to reflect his indebtedness to the partnership for a $10,445 basement telephone system and, in turn, reduced his notes payable account by an annual *pro rata* share of the partnership mortgage principal and interest attributable to the cost of the telephone system.

[2]Defendant's account was adjusted from $626,526 to $607,389.56 to correct water bill allocations and mischarged interest.

but the court's determination as to the extent of the partnership's debt to defendant and the extent of defendant's debt to the partnership. Defendant contends that the circuit court, in reaching these determinations, erroneously ignored the acknowledged agreement of the parties, misapplied the law, and made findings without substantial factual basis in the record. For clarity purposes, we will first collectively address defendant's contentions regarding the written agreement between the parties.

Defendant argues that the court's ruling contravened the 1979 written agreement between the parties that defendant would buy the basement at its construction cost and that defendant would receive compensation at the going market rate for management and janitorial services performed for the building. The circuit court denied any compensation to defendant for his management services, allowed only half of his janitorial fees for the years 1981 to 1987, and ordered to be set off against the partnership's debt to defendant the construction cost of the basement and $252,500, representing the basement's fair rental value for the years defendant occupied the basement.

■■ ■ It is established that partners may establish between themselves their rights and obligations in the partnership through a partnership agreement. (*Estate of McKay v. Moses* (1976), 35 Ill. App. 3d 458, 343 N.E.2d 45.) The partners here, after entering into an oral partnership agreement, entered into a written agreement regarding certain rights and obligations of the partners in the partnership venture. Plaintiffs offer no argument that the partners could not determine their specific rights through a subsequent agreement, but argue that the document signed by the parties is an unenforceable "agreement to agree." The circuit court made the following pertinent findings regarding this agreement: (1) the contract is "neither clear nor concise nor unambiguous"; (2) defendant's ownership interest in the basement "was never perfected" and was "not susceptible of being perfected"; and (3) defendant breached the agreement and his fiduciary duty to plaintiffs by failing to account to the partners for the management of the premises.

A court is to apply ordinary principles of contract law when construing an agreement between partners. (*In re Estate of Johnson* (1984), 129 Ill. App. 3d 22, 472 N.E.2d 72.) In so doing, the court's primary objective is to give effect to the intent of the parties. (*Johnson*, 129 Ill. App. 3d 22, 472 N.E.2d 72.) The intent must be ascertained solely from the language of the agreement where the language is unambiguous; extrinsic evidence may be considered only where the terms are ambiguous. (*P.A. Bergner & Co. v. Lloyds Jewelers, Inc.*

(1986), 112 Ill. 2d 196, 492 N.E.2d 1288.) The determination of whether a contract is ambiguous is a question of law to be determined by the court. *Lenzi v. Morkin* (1983), 116 Ill. App. 3d 1014, 452 N.E.2d 667.

■ The circuit court did not expound on its finding that the agreement was ambiguous. After carefully reviewing the document in question, we find no ambiguity in its terms. The clear and ordinary meaning of the language indicates the partners' intent to sell defendant the basement for its cost in consideration for his conception of the partnership idea and for various efforts in the construction of the office building and to pay defendant a going market rate for the performance of management and janitorial services. We reject plaintiffs' interpretation, asserted for the first time on appeal, that the partners intended defendant would own the basement only in the event that the building be converted to condominium units. The consideration provided for in the agreement does not include any efforts in converting the building to condominium units. The agreement merely states that the partnership has undertaken to construct the office building for "the purposes of securing rental income with the eventuality of splitting off parts as condo office space," without placing any time requirement on the conversion or any obligation upon defendant. Thus, the circuit court erred as a matter of law to the extent its holding rests on a finding of ambiguity in the agreement.[3]

The court also did not expound on its second finding, that defendant's ownership interest in the basement "was never perfected" or "susceptible of being perfected." We fail to understand this seemingly property-based analysis. While it is true that a partner must account to the partnership for any benefit derived by him from any use of the partnership property without his partners' consent (Ill. Rev. Stat. 1983, ch. 106½, par. 21(1)), the agreement providing that the basement space would be sold to defendant, payment to be made over a period of time, establishes between the parties that the property was

---

[3]Although not necessary to our holding, we note that a contrary interpretation is not supported by the extrinsic evidence. Plaintiffs signed affidavits submitted to the Internal Revenue Service in 1987, which provided:

"In 1979, I did sign an agreement giving RUDD the basement section of the building at a cost to him for what improvements were necessary for use. BORYS [SCURIO] and I gave RUDD this property for all the work on obtaining the property, contractors, and other paperwork. Since RUDD intended on moving his accounting practice into the basement, it was agreed that RUDD would handle the management, leasing and maintenance services needed for the building and charge the partnership the average rate for those services."

the individual property of defendant and not partnership property. Assuming defendant's performance of his obligations under the contract, defendant would not be required to account for any benefits he received from use of his personal property.

■ The above leads us to the court's third finding that defendant breached the agreement by failing to account to the partners for the management of the premises. It is established that only a *material* breach of a contract provision will justify nonperformance by the other party. (*Circle Security Agency, Inc. v. Ross* (1982), 107 Ill. App. 3d 195, 437 N.E.2d 667; *Sahadi v. Continental Illinois National Bank & Trust Co.* (7th Cir. 1983), 706 F.2d 193.) The determination of whether a party has committed breach of contract is a question of fact, which will not be disturbed on review unless the finding is against the manifest weight of the evidence. *Barrows v. Maco, Inc.* (1981), 94 Ill. App. 3d 959, 419 N.E.2d 634; *Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 405 N.E.2d 1051.

The "multiple breaches" found by the court include defendant's actions in failing to pay, arrange for payment, or consult with the partners regarding real estate taxes, his failure to file or consult with the partners regarding the Federal income taxes, his failure to discuss with the partners the settlement of a partnership claim, and his failure to account to the partners for the rents received for the basement space.

■ The final two "breaches" found by the court may be summarily disposed of here. As previously discussed, the agreement did not require defendant to account to the partners for rents received from the basement space, and the undisputed evidence reveals that defendant performed his obligations with regard to the basement space. No sound argument may be made that defendant's business decision to settle, in lieu of costly litigation, the $15,000 partnership claim for $10,000, or his failure to seek the other partners' approval of this decision, is a material breach of the contract provision for management services.

As to the court's finding that defendant's actions with regard to the income and real estate taxes were material breaches of the contract, the record reveals that defendant performed significant management services for the partnership during the period 1981 through 1987, including the drafting and negotiation of all tenant leases, the supervision of tenant build-outs, the handling of tenant complaints, the collection of rents and the payment of partnership bills. Undisputed evidence was presented that defendant regularly communicated with plaintiffs and provided plaintiffs with accurate written financial

statements for at least four of the years in question. The record further reveals that the partnership lacked the funds to pay the real estate taxes despite considerable cash advances made by defendant in excess of his allocable share and that the partnership ultimately redeemed the property sold from the tax sale, thereby sustaining only a monetary loss in the form of penalties. Although defendant failed to file partnership returns with the Internal Revenue Service, he accepted personal financial responsibility for the $3,750 loss to the partnership for late filing penalties. In light of these factors, as well as the undisputed evidence of the significant activities performed by defendant in the management of the office building, we hold that the circuit court's finding that defendant materially breached the contract is against the manifest weight of the evidence.

Accordingly, the circuit court erred in refusing to enforce the provisions of the 1979 agreement. In contravention of its terms, the court improperly offset from the partnership debt to defendant the fair value of the basement rent and improperly disallowed the partnership's debt to defendant for his management and janitorial services.

The actions found by the court to warrant nonenforcement of the written agreement apparently also formed the basis for the court's denial of *any* interest on defendant's cash advances to the partnership under the partners' oral agreement to allow interest. As previously discussed, these actions do not support the court's refusal to enforce the parties' agreements. Furthermore, defendant is entitled to the agreed-upon interest rate of 2% over the prime rate. Plaintiffs cite no case law to support the court's decision to allow the agreed-upon interest rate only on Scurio's cash advances. The court denied defendant and Borys the agreed-upon interest rate apparently on the basis that only Scurio's advances were secured by notes executed by all three partners and an assignment of beneficial interest in a land trust. We agree with defendant that the manner in which the debt is evidenced is irrelevant to the issues in the case at bar since all the parties concede the amount of the cash advances made by each partner.

Turning now to defendant's contention regarding the real estate tax penalties and settlement of the partnership's third-party claim, the circuit court ordered that $67,747.78 in late penalties incurred by the partnership be set off against defendant's cash advances to the partnership, as well as the $5,000 disputed third-party claim. Defendant contends that he should not be held liable for his exercise in business judgment where he derived no personal benefit from any of his

mistakes. Plaintiffs, on the other hand, argue that the court did not err in assessing defendant these losses because he violated his fiduciary duty as managing partner to fully apprise his partners of these matters.

It is an established precept of tort law that partnership losses occasioned by a partner's poor judgment or mistakes of judgment will be borne by the partnership so long as the decision does not involve fraud, illegality, or conflict of interest. (*Fields v. Sax* (1984), 123 Ill. App. 3d 460, 462 N.E.2d 983; *Marcus v. Green* (1973), 13 Ill. App. 3d 699, 300 N.E.2d 512.) Equally established is the principle that the partnership relationship is a fiduciary relationship, requiring each partner to fully disclose partnership business to other partners and to exercise the highest degree of honesty and good faith in dealings with each other. *Saballus v. Timke* (1983), 122 Ill. App. 3d 109, 460 N.E.2d 755; Ill. Rev. Stat. 1983, ch. 106½, par. 21.

The record is devoid of any evidence that defendant's actions were tainted by fraud or that defendant lacked good faith. Defendant's negotiation of the partnership's $15,000 claim for $10,000, where the third party asserted only a $7,500 debt, occurred after repeated attempts to collect the debt. Plaintiffs concede that the real estate taxes were not paid due to a lack of funds, that defendant contributed significant cash advances to the partnership to meet its operating expenses, and that defendant made repeated efforts to borrow the funds from conventional lenders. Thus, defendant's decision to settle the third-party claim and his decision to forego payment of the real estate taxes and incur late penalties through redemption of the taxes could only be viewed, if at all, as a poor exercise in business judgment.

Furthermore, the fact that defendant did not obtain plaintiffs' approval of the settlement or inform plaintiffs of the tax sales, without more, does not demonstrate a lack of honesty or fair dealing on defendant's part. Defendant provided plaintiffs with accurate statements of the financial condition of the partnership for the period 1981 through 1983 and the first six months of 1986, which detailed the partnership liability for the accrued real estate taxes. Plaintiffs were also aware of the disputed claim against the third party. The court's finding that defendant, who was regularly making business decisions, breached his fiduciary duty to plaintiffs by not informing them of his decisions to settle the claim or to allow the taxes to be sold is against the manifest weight of the evidence.

Finally, we consider defendant's contention that the circuit

court erred in ordering plaintiffs' attorney fees and certain account-ant fees be paid from the partnership assets. The circuit court or-dered to be paid from the partnership assets $7,922.06 in fees from the accountant hired by plaintiffs after the 1988 injunctive order and $36,002.30 representing fees by plaintiffs' attorney after January 1988. Attorney fees and litigation expenses are generally not recov-erable in the absence of statutory provision or agreement of the par-ties. (*Susman v. Cypress Venture* (1989), 187 Ill. App. 3d 312, 543 N.E.2d 184.) The parties do not dispute the absence of such a con-tract or statutory provision, but disagree as to whether the fees were properly assessed as the partnership entity's fees.

■ Defendant argues that the services in issue consist exclu-sively of efforts aimed at maximizing plaintiffs' interests and mini-mizing defendant's interests on dissolution of the partnership. In re-sponse, plaintiffs have not directed us to any evidentiary support for a finding that the questioned fees are attributable to partnership ser-vices. Our review of the legal charges attached to the court's judg-ment order reveals charges commencing on February 16, 1988, through the close of trial on this matter on October 10, 1989. For the most part, the services were rendered after defendant's letter dissolving the partnership and include services for settlement efforts, trial preparation, and all aspects of the trial. Because these services pertain to plaintiffs' individual interests, the circuit court had no au-thority to order the fees payable from the partnership assets.

The evidence relating to accounting services consists of testimony from the accountant hired by plaintiffs following the court's injunc-tive order. On examination by defendant's counsel, the accountant testified that he received payment for certain accounting services rendered, but that he had not been paid for statements of June 30, 1988, and August 31, 1988. The following colloquy then ensued:

"THE COURT: Gentlemen, you heretofore represented to me that there were no third party obligations.

[DEFENDANT'S COUNSEL]: I was unaware of it.

THE COURT: Were you unaware?

[PLAINTIFFS' COUNSEL]: Of Mr. Recchia's outstanding bill?

THE COURT: Yes.

PLAINTIFFS' ATTORNEY: I'm aware of it, your Honor, but I consider it a nonpartnership debt because you dissolved of [*sic*] the partnership in November of '88 and this bill came after that."

Defendant's attorney abandoned further inquiry into the accountant's

services. Under these circumstances, it was error for the court to order the accountant fees to be paid from the partnership assets.

In summary, we reverse the following portions of the judgment order: (1) the $252,000 set off against the partnership's debt to defendant for the basement rental value, (2) the $67,747.98 set off against the partnership's debt to defendant for real estate tax penalties, (3) the $5,000 set off against the partnership's debt to defendant for the third-party claim, (4) the assessment of $36,002.30 and $7,922.16 in attorney and accountant fees to the partnership, (5) the omission from the partnership's debt owing to defendant compensation for management and janitorial services, and (6) the omission from the partnership's debt to defendant interest on defendant's cash advances at a rate of 2% over the prime rate. Accordingly, the case is remanded to the circuit court for further proceedings consistent with this opinion.

Reversed and remanded.

CAMPBELL and O'CONNOR, JJ., concur.