COMMONWEALTH EDISON COMPANY, an Illinois Corporation, Plaintiff,

v.

DIVERSIFIED TECHNOLOGIES GROUP, INC., a Maryland corporation, and Charles E. Jensen, d/b/a Diversified Technologies, Defendants.

No. 93 C 4138.

United States District Court, N.D. Illinois, Eastern Division.

May 25, 1995.

---

Gregory J. Simon, Simon & Spitalli, Chicago, IL, for Commonwealth Edison Co., an Ill. Corp.

Kenneth Emanuel Kraus, Bradley Paul Nelson, Schopf & Weiss, Chicago, IL, for Diversified Technologies Group, a Maryland Corp., Charles E. Jensen, dba, Diversified Technologies.

### MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Plaintiff Commonwealth Edison Company ("ComEd") brings this two-count complaint against Diversified Technologies Group, Inc. ("Diversified/Maryland") and Charles E. Jensen d/b/a Diversified Technologies ("Jensen" or "Diversified") for breach of contract.[1] Defendant Jensen has brought two amended counterclaims for breach of contract, alleging that ComEd unduly delayed Diversified's performance under the contract and wrongfully terminated the agreement. ComEd has moved for summary judgment on Count II of its complaint, and on Counts I and II of Jensen's counterclaims. For the reasons set forth below, plaintiff's motion is denied.

### I. Background

Since 1984 ComEd, a large electricity producer, had been looking for a way to dispose of certain radioactive wastes it produced when decontaminating the Unit One Reactor at the Dresden Nuclear Power Station. These wastes consisted of a liquid solution used to remove radioactive oxides from the inside of pipes ("NS–1") and radioactive particulates suspended in that solution. ComEd concentrated this NS–1 solution, producing "NS–1 Concentrates" and a vapor containing small amounts of NS–1 and radioactive particles. This vapor was condensed and "demineralized," meaning it was passed through a demineralization chamber filled with resin beads. The contaminated particulates bonded with the resin beads, yielding clean water and contaminated beads. The resin beads were then suspended in water to form a slurry called "NS–1 Supernatant" or "NS–1 Resin Slurry". ComEd stored the resulting waste in four tanks: three tanks of NS–1 Concentrates and one tank of NS–1 Resin Slurry. ComEd eventually planned to solidify these wastes in fifty-five gallon drums with a vinyl-ester-styrene binder, and store them at an arid, low-level nuclear waste disposal site. The United States Nuclear Regulatory Commission ("NRC") approved this plan in an Environmental Impact Statement ("EIS"), concluding that solidification and storage of the solid waste at either the Hanford, Washington site or the Beatty, Nevada site would be acceptable. Because these two arid waste sites would be closed to ComEd shipments after December 31, 1992, the company set out to procure a contractor to perform the necessary solidification before that date.

In June 1990 several of Diversified/Maryland's representatives, including Vice President Jensen, met with ComEd to discuss solidification of the NS–1 waste. Diversified claimed that it could solidify ComEd's wastes by this NRC–approved method, and that the process could be completed by the December 31, 1992 deadline. On June 13, 1990, ComEd distributed a Bid Specification to Diversified and a competitor (which eventually chose not

---

1. On September 1, 1993, plaintiff obtained default judgment against Diversified/Maryland on Count I of the Complaint. Consequently, only Count II against Jensen remains.

to bid), wherein ComEd stated that the chosen contractor must comply with (1) the prescribed timetable for solidification,[2] (2) the terms of the EIS issued by the NRC, and (3) all applicable regulations and licenses for solidification and storage. Diversified submitted an initial proposal in August 1990, offering to solidify all 2317 cubic feet of the NS–1 waste [3] with vinyl-ester-styrene binders for $460.50 per cubic foot of waste plus $90,600 in "Mobilization/Demobilization" costs, for a total of $1,157,580. Complaint, Exb. 2C, at PFI–2A. The initial proposal also indicated that Diversified could complete the project within ten months of the start date, and that the company knew time was of the essence. Although Diversified suggested two alternative means of solidifying the NS–1 Supernatant ("dewatering" and "VERI processing"), ComEd claims that it did not plan on using either of these two methods.[4] After this bid was submitted, the parties learned that the amount of liquid that needed to be solidified was more than previously calculated, since the NS–1 Concentrates had to be diluted before they could be properly solidified. Diversified amended its bid to take into account the additional liquid needed for dilution, and agreed to charge $398 per cubic foot of these "Additional NS–1 Dilution Volumes."

These and other documents were eventually incorporated into ComEd's Purchase Order to Diversified dated December 11, 1990. The order listed the price for solidification per cubic foot of each kind of waste, and stated that delivery was required in the manner outlined in the Bid Specification.

ComEd agreed to pay $425,000 up front for the solidification processing, and Diversified would receive additional payments as work was performed and invoiced.

As Diversified began manufacturing the equipment needed for the project, the parties ran into a series of disputes. First, in July 1991 the parties raised the possibility of solidifying the NS–1 Resin Beads through either dewatering or VERI processing.[5] Diversified subsequently obtained NRC approval for VERI processing of the waste in October 1991, and ComEd agreed to use that process to solidify the 600 cubic feet of NS–1 Resin Slurry. In order to utilize this process, however, Diversified would have to remove the liquid from the NS–1 Resin Slurry, and processes it separately. Diversified submitted a separate proposal to demineralize this material, but ComEd hired its on-site demineralization and dewatering provider, Chem–Nuclear Systems, Inc. ("CNSI"), to perform the required work on the additional liquid. In an October 18, 1991 fax transmission, Jensen informed ComEd that Diversified considered the contract with ComEd to include the treatment of all 600 cubic feet of resin slurry, and therefore Diversified would bill ComEd for the additional liquid amounts regardless of which treatment method was used on the NS–1 Resin Slurry and which company treated the additional liquid component.[6]

Second, Diversified informed ComEd during this same time period that it had obtained favorable results in solidifying samples of the undiluted NS–1 Concentrates.[7]

**2.** The Bid Specification listed a start date of October 1, 1990 and a completion date of October 1, 1991.

**3.** The total amount of waste was estimated in the Bid Specification to be 1717 cubic feet of NS–1 Concentrates and 600 cubic feet of NS–1 Resin Slurry.

**4.** Jensen claims that ComEd was considering both of these alternatives from the beginning, based on the fact that he discussed them with representatives of ComEd at various times prior to the acceptance of its bid. Defendant's 12(N) ¶ 19.

**5.** ComEd claims that it believed such services to be outside the scope of its contract with Diversified, Plaintiff's 12(M) ¶ 36, but Diversified points

out that these methods had been suggested in its Initial Proposal. Defendant's 12(N) ¶¶ 34, 36.

**6.** ComEd contends that it never agreed to this interpretation of the contract.

**7.** Although this information was submitted to the NRC for approval, the parties dispute how it got there. Jensen claims that Diversified conducted these tests and sought approval from the NRC without any assistance from ComEd, while ComEd claims that it approved the plan to seek NRC approval and had a project manager at Dresden submit a letter in support of Diversified's tests. The end result, however, was that the NRC approved this method of treating the NS–1 Concentrates, thereby obviating the need to dilute this waste prior to treatment.

In an October 22, 1991 fax transmission, Jensen told ComEd that if the NS–1 Concentrates did not need to be diluted, the price for processing the waste would be increased from $460.50 per cubic foot to $730 per cubic foot. Although ComEd initially resisted this modification, it agreed in a December 20, 1991 letter to pay the increased figure because of the need to process the waste in time to meet the December 31, 1992 deadline. Jensen responded in a January 7, 1992 letter, blaming ComEd for the delays in the project[8] and suggesting that but for the assistance of Diversified, "this project may well have failed to meet the 1992 deadline." Plaintiff's 12(M) ¶ 53.

Finally, the parties disagreed about how the solidified waste should be tested before shipping. Apparently, the State of Nevada (which regulates the Beatty storage site) requires all solidified drums of radioactive waste to be physically tested for free standing liquid. In order to comply with this regulation, ComEd demanded that a "drum tipper" be included in Diversified's solidification system. However, Diversified did not believe that such an apparatus was required by Nevada, and therefore did not initially develop its system to incorporated it. Consequently, after Diversified put the drum tipper in its system, it invoiced ComEd for the additional cost. This invoice was disputed by ComEd because it believed that the cost of such measures was included in the contract price.

In an effort to resolve these and other disputes, the parties engaged in discussions between January 1992 and March 1992, leading up to the execution of a letter agreement dated March 11, 1992 ("Letter Agreement"). In this agreement ComEd promised to pay $460.50 per cubic foot of waste, as well as certain other bonuses as work was completed, including a $100,000 bonus if:

> The entire volume of NS–1 which is the subject of the Contract is solidified in its present concentrated form and packaged and otherwise made ready for transportation from Edison's Dresden Plant site prior to December 31, 1992.

Complaint, Exb. 3, at 1. In exchange, Diversified dropped its claims based on delays and the installation of the drum tipper. Diversified then began processing the NS–1 Concentrates and completed that portion of the project in late July 1992.

This respite was short lived. After the NS–1 Concentrates were solidified and shipped, ComEd required Diversified to remove all of its solidification equipment before installing the NS–1 Resin Slurry processing equipment. ComEd claims this was done for safety reasons, while Diversified maintains that the solidification equipment posed no safety risk and that ComEd's orders significantly delayed work on the NS–1 Resin Slurry. The VERI processing equipment was finally installed in September 1992, and processing of the NS–1 Resin Slurry was set to begin in October 1992. However, on October 16, 1992, Diversified's VERI processing failed to completely solidify a large container of resin beads. ComEd immediately stopped work on the project, and demanded that Diversified identify the cause of the failed solidification, suggest a means of remediating the partially solidified waste, and provide some assurance that its VERI processing would work properly on the remaining waste. At the same time, ComEd began looking into dewatering the resin beads with another vendor. The parties also began exchanging numerous communications complaining of overcharges and failed payments. ComEd also informed Diversified that in order to resume operations, it would have to demonstrate the repeatability of VERI processing tests on multiple resin samples.[9] Diversified claims that it worked extensively between October 16 and November 20, 1992, and asserts that it was able to repeat successful solidification tests by November 20. ComEd disputes this contention, and maintains that Diversified never demonstrated that it could successfully

---

8. In particular, Jensen claimed that ComEd refused to allow Diversified to begin operations until it installed an air filtration system, thereby delaying solidification until March 1992.

9. Diversified claims that this demand was not made until November 19, 1992, just one day before the contract was terminated. ComEd maintains that notification was given long before that date.

solidify multiple samples of resin beads from the same liner under the same conditions.[10] ComEd informed Diversified on November 20, 1992 that it could no longer wait for it to produce satisfactory results, and therefore it was terminating Diversified's performance and hiring CNSI to dewater the remaining NS–1 Resin Slurry. Diversified then invoiced ComEd for several charges, including a $100,000 bonus for solidification of the NS–1 Concentrates.

## II. Summary Judgment Standard

A motion for summary judgment will be granted if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant bears the initial burden of identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Once the moving party has met this burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Maxwell v. City of Indianapolis,* 998 F.2d 431, 433 (7th Cir.1993). In deciding a motion for summary judgment the court must not evaluate the weight of the evidence, but simply determine whether a genuine issue remains for the trier of fact to decide. *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994). If there are sincere doubts as to the existence of genuine issue of triable fact, "then those doubts should be resolved in favor of the nonmoving party and summary judgment ought to be denied." *Id.* Although issues of contract interpretation are generally suited for resolution through summary judgment, this mechanism will only be available if the contract is unambiguous and material facts relating to the parties' performance are not disputed. *See ECHO,*

*Inc. v. Whitson Company, Inc.,* 52 F.3d 702, 705 (7th Cir.1995).

## III. Discussion

Plaintiff moves for summary judgment on Count II of its complaint and defendant's counterclaims. It contends that it was entitled to terminate the contract because Diversified breached its obligations under the agreement. ComEd also challenges Diversified's claim that it is entitled to bonuses for completing the project, as well as its claims for delays, equipment and binders. Jensen responds that ComEd had no right to terminate the agreement, either because of Diversified's alleged nonperformance or because of billing disputes between the parties. Jensen also contends that ComEd acted in bad faith to prevent its performance, and owes Jensen bonuses and extra-contractual expenses.

### A. ComEd's Termination of the Contract

■ ComEd claims that Jensen and Diversified breached their obligations under the agreement by failing to solidify the NS–1 Resin Slurry in time for transportation to an arid waste site. Further, ComEd claims that Diversified overcharged it for certain services and refused in bad faith to repay these amounts. It is settled law in Illinois[11] that when a party to a contract materially breaches the agreement, the injured party is relieved from its duties and may consider the contract terminated. *Arrow Master, Inc. v. Unique Forming Ltd.,* 12 F.3d 709, 714 (7th Cir.1993) (quoting *Borys v. Rudd,* 207 Ill. App.3d 610, 152 Ill.Dec. 623, 628, 566 N.E.2d 310, 315 (1990), *app. denied,* 139 Ill.2d 593, 159 Ill.Dec. 104, 575 N.E.2d 911 (1991)). The Seventh Circuit has articulated the proper approach to contract interpretation:

In construing the terms of a contract, a court is required to engage in a two-fold inquiry. First, it is necessary to look at the plain language of the provision at issue. Reviewing Illinois law, this Court has noted that "[t]he starting point must be the contract itself. If the language of the

---

**10.** ComEd also points to the absence of any recorded test results supporting Diversified's claim of repeatability, to which Diversified responds that it was kicked off the project site before the positive results could be recorded.

**11.** Both parties assume that Illinois law supplies the rule of decision in this case.

contract unambiguously provides an answer to the question at hand, the inquiry is over." ... If the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide. However, if the parties dispute the extrinsic evidence on an ambiguous contract, then a factfinder must be called upon to determine the intent of the parties.

*Lumpkin v. Envirodyne Indus.*, 933 F.2d 449, 456 (7th Cir.), *cert. denied,* 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (citations omitted). In the instant case, we must decide whether the contract required Diversified to solidify all the wastes in time for ComEd to ship them to their storage sites by December 31, 1992.

ComEd's Bid Specification stated that the project had to be completed within a year, and that solidification of the wastes needed to comply with the EIS (which required storage in at an arid site). In its Initial Proposal, Diversified agreed to meet ComEd's proposed schedule and claimed that it could complete the project within ten months. Diversified also stated that "because of uncertainties related to future burial site access, Diversified considers time of the essence in this contract. Our use of already-proven technology and equipment should increase the probability of schedule adherence. . . . By this schedule, the NS–1 media would be ready to ship approximately February 1, 1991 which would permit nearly a year to complete shipment of waste for disposal." Complaint, Exb. 2C, at III–3. ComEd's purchase order also stated that the project needed to be completed according to the schedule laid out in the Bid Specification.[12] Reviewing all of these documents, we believe the contract clearly and unambiguously required that performance be completed before the

December 31, 1992 deadline. Jensen's contentions to the contrary are simply not supported by the plain language of the documents.[13] Further, although Jensen testified in his deposition that Diversified never agreed to this timetable, this assertion is contradicted by the language of the contract and thus carries little weight. Given the repeated references in the contract documents to the need to complete the project within the specified time period, and to have the waste stored in compliance with the EIS, the timing of the project appears to be "of such a nature and of such importance that the contract would not have been made without it." *Haisma v. Edgar,* 218 Ill.App.3d 78, 161 Ill.Dec. 36, 41, 578 N.E.2d 163, 168 (1991). Therefore, failure to perform consistent with this condition would constitute a material breach. Having found that the contract required Diversified to perform by the December 31, 1992 deadline, we must now determine whether Diversified actually breached this material condition.

ComEd claims that Diversified never solidified the NS–1 Resin Slurry, and that its only attempt to do so on October 16, 1992 was a failure. Plaintiff claims that Diversified refused to conclusively identify the cause of the failed solidification, and failed to produce repeated successful tests of its process. Consequently, ComEd argues, it was entitled to terminate the agreement on November 20, 1992, and seek another vendor to complete the project.

However, Diversified disagrees with several of ComEd's assertions. First, it contends that notwithstanding the failed solidification on October 16, by November 20 it had performed several successful tests and was able to complete the project. Although ComEd disputes this contention, Jensen presents de-

---

12. Diversified claims that because a proposed schedule was not included on the front cover of ComEd's purchase order, the contract did not contain a time deadline. However, this assertion is belied by the purchase order's reference to the delivery requirements of the Bid Specification, as well as by the testimony of ComEd's purchasing buyer, who asserted that this schedule was incorporated into the purchase order.

13. Jensen's argument that any deadline was waived because ComEd did not complain about the failure to complete the project by October 1, 1991 fails to take account of the fact that the parties explicitly premised the deal on the ability of Diversified to complete the project by the December 1992 deadline. Indeed, Diversified's Initial Bid stated that the company could complete the project almost a year before the waste needed to be transported to Beatty or Hanford.

position testimony from himself and other Diversified officers that supports his position. Second, Jensen claims that ComEd delayed the project for several months before allowing Diversified to begin solidification, and therefore cannot legitimately claim that Diversified failed to perform within the time allotted. In particular, Jensen complains of ComEd's tardy installation of an air filtration system and its requirement that Diversified remove its solidification equipment before beginning VERI processing of the resin beads. Jensen also contends that ComEd itself may have been responsible for the failed solidification on October 16, 1992, by disposing of left-over NS–1 Concentrates in the liner which was to be used for the resin beads.

Viewing all the evidence in a light most favorable to Jensen, we cannot conclude as a matter of law that Diversified materially breached the agreement. Although the initial VERI processing of the resin beads was unsuccessful, Jensen and Diversified's personnel stated that the project could have been completed in the requisite time. ComEd presents certain evidence challenging the veracity of these statements, but summary judgment is not a vehicle for determining the credibility of the parties' witnesses. *See Del Raine v. Williford*, 32 F.3d 1024, 1037 (7th Cir.1994). Similarly, there is conflicting evidence as to whether ComEd caused certain delays, and whether these delays significantly impeded Diversified's ability to complete the project on time. These issues are also not ripe for resolution at this stage, and preclude our granting summary judgment.

■ ComEd next argues that it was entitled to terminate the agreement under the express language of the contract. In support of this argument it points to the following language in its Bid Specification:

*Owner may at any time* on three (3) days' [sic] Notice to Contractor extend, suspend or delay Contractor's performance of the Work or *terminate the Contract if* Owner determines that the project or facility of which the Work is a part or Owner's intended use of that project or Work is likely to be delayed, changed, or stopped due to causes beyond the reasonable control of Owner including, but not limited to, acts of God, fire, explosion, site conditions, shortages of fuel, any act or failure to act of any Governmental Authority, strikes, labor disputes or work stoppages; or if *Owner determines that the project, facility or Work should be delayed, suspended or stopped due to* changes in the anticipated load on Owner's system, or to other *causes related to Owner's requirements and obligations as a public utility.*

Complaint, Exb. 2B (emphasis added). ComEd claims that it was entitled to terminate the agreement because Diversified jeopardized its ability to meet its obligations as a public utility—i.e., dispose of the NS–1 waste at an arid facility. Jensen attacks this claim by arguing that ComEd never decided to delay, suspend or stop the project, but rather, decided to hire another company to continue and complete the project. Further, Jensen argues that ComEd was actually responsible for the delay in completing the project, and therefore cannot contend that Diversified threatened its ability to perform.

Although a closer call, we also believe that this issue is not ripe for resolution on summary judgment. In order for ComEd to avail itself of this provision it must show that Diversified was unable to perform its obligations under the contract. However, as discussed above, material facts remain in dispute as to whether Diversified was able to perform its obligations on November 20, 1992. Moreover, Jensen claims that the contract entitled Diversified to solidify all the NS–1 waste present at the facility, and ComEd could not simply have another vendor dewater the resin beads or treat the liquid portion of the NS–1 Resin Slurry. By hiring another contractor, Jensen argues, ComEd wrongfully breached the agreement and thus should not be allowed to rely on the termination clause. Absent resolution of these issues, it is impossible to determine whether ComEd acted within the terms of this provision when it terminated Diversified's performance.

■ ComEd's final argument in support of its decision to terminate the agreement is that Diversified, in overcharging ComEd for its services and refusing to repay the sur-

plus, acted in bad faith. In particular, ComEd claims that in six invoices Diversified failed to charge it the "revised processing and packaging fee" outlined in Addendum No. 3 to Diversified's Initial Proposal,[14] but instead charged a higher rate. Jensen responds that it did not overcharge for its services, but rather, invoiced according to the terms of the Letter Agreement, which expressly overruled contrary provisions in the original contract. Further, Jensen argues that even if these invoices were incorrect, there is no support for ComEd's assertion that this conduct constituted a material breach.

We disagree with Jensen that the Letter Agreement altered the invoicing scheme outlined in Addendum No. 3. The letter agreement states that ComEd agrees to pay a total of $460.50 per cubic foot of waste solidified, as well as an additional $450,000 when certain portions of the project were completed. However, it does not speak as to how these charges will be invoiced, and thus does not contradict the schedule outlined in Addendum No. 3.

■ Nonetheless, ComEd has not demonstrated that this conduct by Diversified constituted a material breach of the agreement. *See Arrow Master, Inc.*, 12 F.3d at 715 (performance of provision at issue must be "*sine qua non* of the contract's fulfillment" in order for nonperformance to be material breach). Indeed, it appears that this improper invoicing could have been rectified at the conclusion of the project, had it actually been completed. Moreover, to the extent ComEd argues that this improper invoicing was evidence of bad faith, resolution of that issue is improper at this stage because material facts remain in dispute.[15] *See Case v. Forloine*, 266 Ill.App.3d 120, 203 Ill.Dec. 256, 260, 639 N.E.2d 576, 580 (1993) (questions of good faith performance fall within exclusive province of trier of fact). Accordingly, plain-

tiff's motion for summary judgment on Count II of its complaint must be denied.

### B. Jensen's Counterclaim for Bonuses

■ Plaintiff also moves for summary judgment on the portion of Jensen's counterclaims wherein he claims that ComEd failed to pay certain bonuses promised to Diversified under Letter Agreement. ComEd asserts that the Letter Agreement tied bonuses to the completion of certain percentages of the *entire* project, but that Diversified charged ComEd according to when it completed solidification of the NS–1 Concentrates. In support of its position ComEd quotes language of the Letter Agreement, which refers to the "solidification of certain wastes ('NS–1')" and requires Diversified to solidify "[t]he entire volume of NS–1 which is the subject of the Contract." However, Jensen points to a later portion of the Letter Agreement, which states that Diversified must solidify the NS–1 "in its present concentrated form." As only the NS–1 Concentrates were in a "concentrated form," Jensen argues that treatment of the NS–1 Resin Slurry was not included in the calculation of these bonus payments.

This contradictory language renders the Letter Agreement ambiguous, as we cannot conclude with a sufficient degree of certainty that the parties tied these bonuses to the completion of the entire project. While we would not be precluded from declaring the meaning of the contract if the external evidence was undisputed, both parties have pointed to conflicting evidence surrounding the negotiations that led up to the consummation of the Letter Agreement. Where material issues of fact remain in dispute, we cannot use summary judgment to declare the meaning of an ambiguous contract. *See Lumpkin*, 933 F.2d at 456. Accordingly, plaintiff's motion for summary judgment on the issue of Diversified's bonuses is denied.

---

14. In order to provide more up-front cash for Diversified, Addendum No. 3 provided for higher initial payments, and reduced payments ($276.58 per cubic foot) for processing which took place at least forty-five days after the project began.

15. Specifically, Jensen claims that ComEd paid several of the invoices at issue without complain-

ing, and only objected to the invoicing of the project after it decided to hire another contractor to complete the job. ComEd denies this, and argues that Jensen's invoicing was done in bad faith after it failed to solidify the contaminated resin beads on October 16, 1992.

## C. Counterclaim for Additional Expenses

ComEd also moves for summary judgment on Jensen's claims for delays, equipment and supplies. Jensen claims that ComEd delayed its processing of the NS–1 wastes by (1) allowing Diversified to solidify the NS–1 Concentrates only after ComEd installed an air filtration system, and (2) requiring Diversified to remove its solidification equipment before beginning VERI processing of the NS–1 Resin Slurry. ComEd disputes Diversified's claim that the installation of an air filtration system caused the earlier delay, contending that Diversified was delayed in its treatment of the NS–1 Concentrates because it was required to install a drum tipper into its assembly line. Plaintiff also argues that Jensen cannot recover for the second alleged delay because Diversified was still working on the project, pursuant to directives given by ComEd in order to insure the safety of the workers at the facility, and the contract only provided for delay compensation when work on the project was completely halted. Therefore, ComEd argues, Jensen's claims for delay from February 1, 1992 to March 10, 1992, and from July 25, 1992 to October 1, 1992, must fail.[16] Jensen responds by reaffirming his position that the earlier delay was caused (at least in part) by ComEd's tardy installation of an air filtration system, and arguing that the drum tipper was not included as part of the project in its Bid Proposal, and the State of Nevada did not require it for the disposal of these wastes. Jensen also contends that ComEd's requirement that Diversified's equipment be removed before beginning VERI processing was not a reasonable safety restriction, but an unreasonable restriction on Diversified's ability to complete the project on time.

■ With regard to Jensen's claim for the period from February 1, 1992 to March 10, 1992, material issues of fact remain in dispute. Specifically, it is unclear whether the delay was caused by ComEd's activities or Diversified's installation of the drum tipper. While it is true that delays stemming from the later cause would not be reimbursable, since Diversified specifically released any such claims in the Letter Agreement, delays caused by the former may well be compensable. Because the parties present conflicting evidence as to the cause of this delay, we cannot grant summary judgment.

■ Similarly, Jensen's other claims of delay are also not resolvable at this juncture. ComEd claims that it required the solidification equipment to be removed before beginning VERI processing due to safety concerns. However, it fails to point to any admissible evidence to support this assertion. Although Jensen fails to directly confront ComEd's explanation of this delay, ComEd's motion must be denied because it has failed to satisfy its initial burden of demonstrating that no genuine issue of material fact exists. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Accordingly, this portion of plaintiff's motion is also denied.[17]

■ Finally, we address plaintiff's challenge to defendant's counterclaim for the cost of equipment and supplies which were purchased in the course of the project. ComEd points to portions of the Bid Specification that obligate Diversified to provide and pay for all equipment and materials needed for the project. Jensen claims, however, that the equipment at issue was not listed in the Bid Specification and was not required for completion of the project; rather, Jensen asserts, this equipment was purchased at ComEd's insistence. Additionally, Diversified seeks reimbursement for supplies it claims spoiled because of ComEd's unjustified delays.

While the contract unambiguously requires Diversified to pay for equipment that is re-

---

**16.** Jensen does not claim any amounts for delays prior to February 1, 1992, because the Letter Agreement explicitly resolves any such claims.

**17.** Plaintiff's final argument on issue of compensation for delay is that even if it is chargeable with such delay, it cannot be held liable under the contract for weekends and holidays. Although the Bid Specification provides for the regular work week to exclude Saturday, Sunday and holidays, it also allows for work to continue during these times if needed. Consequently, we cannot say as a matter of law that Jensen would not be entitled to recover for delays that precluded Diversified from working on weekends and holidays.

quired to complete the project, we cannot conclude that the equipment in question falls into this category because the parties present conflicting evidence. Nor can we say that Diversified's counterclaim for spoiled supplies is invalid, as Jensen has raised a triable issue of fact with regard to ComEd's delays. Accordingly, plaintiff's motion must be denied.

### IV. Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment on Count II of its complaint and Counts I and II of defendant's counterclaims is denied. It is so ordered.