HUNT'S GENERATOR COMMITTEE; Allen–Bradley Company, Inc.; Case Corporation; Chrysler Corporation; Cooper Industries, Inc.; General Motors Corporation; Harris Metals, Inc.; Journal/Sentinel Inc.; Ladish Company, Inc.; P.P.G. Industries, Inc.; Newell Co.; Nordberg Inc.; S.C. Johnson & Son, Inc.; and Western Publishing Company, Inc., Plaintiffs,

v.

BABCOCK & WILCOX COMPANY; Bucyrus–Erie Company; Town of Caledonia; Johnson Controls Battery Group, Inc., as successor in interest to Globe–Union, Inc.; Modine Manufacturing Company; Village of North Bay; City of Oak Creek; Pabst Brewing Company; Primerica, Inc.; City of Racine; Racine Unified School District; City of St. Francis; Village of Silver Lake; City of South Milwaukee; Village of Wind Point; Caterpillar Tractor Company; Mid–America Steel Drum Co., Inc.; Howmet Corporation, and Varity Corp., Defendants.

Civ. A. No. 93–C–324.

United States District Court, E.D. Wisconsin.

Sept. 29, 1994.

Chris J. Trebatoski, Michael, Best & Friedrich, Milwaukee, WI, for plaintiffs.

Joseph E. Boyle, City Atty., Racine, WI, for defendant City of Racine.

Raymond J. Pollen, Riordan, Crivello, Carlson, Mentkowski & Steeves, S.C., Milwaukee, WI, for defendant City of St. Francis.

Walter Kuhlman and Richard J. Delacenserie, Boardman, Suhr, Curry & Field, Madison, WI, for defendant City of Oak Creek.

Arthur J. Harrington and Jamer G. Schweitzer, Godfrey & Kahn, S.C., Milwaukee, WI, for defendant Pabst Brewing Co.

Pamela H. Schaefer, Cook & Franke, S.C., Milwaukee, WI, for defendant Modine Mfg. Co.

Jeffrey Leavell, Capwell, Berthelsen, Nolden, Casanova, Kallenbach, Leavell & Grahovac, Ltd., Racine, WI, for defendant Racine Unified School Dist.

Michael J. Cieslewicz, Kasdorf, Lewis & Swietlik S.C., Milwaukee, WI, for defendant Bucyrus–Erie Co.

Robert W. Thomson, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, PA, for defendant Babcock & Wilcox Co.

Matthew H. Quinn, Hand & Quinn, S.C., Racine, WI, for defendant Village of North Bay.

Richard J. Sankovitz, Whyte, Hirschboeck & Dudek, Milwaukee, WI and Joseph G. Murphy, City Atty., South Milwaukee, WI, for defendant City of South Milwaukee.

Kenneth F. Hostak, Thompson & Coates, Ltd., Racine, WI, for defendant Town of Caledonia.

Thomas G. Echikson, Sidley & Austin, Washington, DC, for defendant Johnson Controls Battery Group.

Craig W. Nelson, Nelson, Dries & Zimmerman, S.C., Brookfield, WI, for defendant Village of Silver Lake.

Dennis L. Fisher, Meissner & Tierney, S.C., Milwaukee, WI, for defendant Mid–America Steel Drum Co. Inc.

Theodore L. Garrett, Covington & Burling, Washington, DC, for defendant Howmet Corp.

Joseph V. Karaganis, A. Bruce White, and John W. Kalich, Karaganis & White Ltd., Chicago, IL, for defendant Primerica, Inc.

William J. Hickmann and Gregory J. Stacker, Law Office of William J. Hickmann, S.C., West Bend, WI, for defendant Varity Corp.

John Shannon, Coates, Foley, Dye & Shannon, Racine, WI, for defendant Village of Wind Point.

## ORDER

TERENCE T. EVANS, Chief Judge.

A few months ago, I thought I would, at this time, be getting ready to watch the World Series. As a baseball lover, that was a warm thought indeed. But alas, the World Series is not, this year, meant to be. So my attention is not on baseball today but on this case, brought under 42 U.S.C. § 9601 *et seq.,* The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Please excuse me if, while discussing the case, my mind wanders a bit to things that might have been.

The plaintiffs are an unincorporated association of corporations (much like the owners of major league baseball teams), referred to as Hunt's Generator Committee. They have entered into a consent decree with the United States Environmental Protection Agency for cleanup of a landfill, known as Hunt's Landfill, in Racine County, Wisconsin. The consent decree served the purpose of a salary cap limiting the financial liability of the members of the committee. The committee seeks contribution from the defendants, who are other entities potentially responsible for the cleanup. One of the defendants, Mid–America Steel Drum Co., Inc., has moved for summary judgment, seeking dismissal from the lawsuit on the basis that it is not a successor to the potential liability of Northwestern Drum Company. It is not unlike the situation in 1970 when the Milwaukee Brewers wanted nothing to do with the debts of their predecessor, the Seattle Pilots.

The following facts are undisputed. From September 1959[1] until May 1962, Harold

---

1. September of 1959 was an exciting time. The San Francisco Giants—who blew off Manhattan's Polo Grounds after the 1957 season—were leading the Dodgers and the Braves (Milwaukee, not Atlanta) by two games with eight to go in the race for the National League Pennant. But the Giants were playing in old Seals Stadium (a minor league park), a place not suited for World Series play. If they made it to the Series, they thought, they might want to play in the yet unfinished Candlestick Park. They were in a pickle—which way would they go? Fortunately, their

old friends, the Dodgers (who, like the Giants, had broken hearts the year before by running away from Ebbets Field) came to the rescue. The Dodgers beat the Giants three straight times over the weekend of September 19–20, sending the Giants reeling into third place. There would be no need to choose between Candlestick Park and Seals Stadium. The World Series instead would be won by the transplanted Dodgers, with a team peppered with old Brooklyn stars like Gil

Itzenhuiser operated the landfill in question. Clayton Hunt purchased it in May 1962 and operated it until September 1970,[2] when he sold it to Elmer Lauer and Joe Magestro. They formed the Caledonia Corporation in December 1970 and operated the landfill until May 1974, when it was closed.

Northwestern Drum Company (NDC) was an Illinois corporation engaged in the business of reconditioning and reselling used barrels or drums. It was located in Oak Creek, Wisconsin. A company called Lake Disposal hauled waste from NDC to the Hunt's site, but only at a time prior to the time Mr. Hunt sold it to Mr. Lauer and Mr. Magestro in 1970.

In 1975,[3] NDC was solely owned by Lawrence C. Majewski. In March of that year, NDC agreed to sell its assets, subject to certain of its liabilities, to a partnership. The partners incorporated the Mid–America Steel Drum Company, Inc. for the purpose of acquiring and leasing NDC's assets as an operating business. The asset acquisition was closed on April 8, 1975.[4] The purchase agreement provided that Mid–America shall assume

> [a]ll of the debts, obligations and liabilities of Northwestern shown on its balance sheet as of December 31, 1974, as such liabilities have increased or diminished in the ordinary course of business to the date [of the assumption][.]

The asset sale between the two companies was not completed with the intent to defraud anyone seeking to recover cleanup costs for any type of environmental contamination.

NDC and Mid–America had no common owners. When Mid–America was formed, its president was Edward Ruskamp, who had been a vice-president of marketing for NDC. Gene Simonis, who had worked part-time at NDC in the maintenance department, was called up to the majors and became an officer of Mid–America after the acquisition. In March 1981, at the time he was deposed, Mr. Simonis was president of Mid–America.

Mid–America employed the same people as did NDC. It operated at the same location as NDC, used the same production facilities, and made the same product. In addition, it informed the NDC customers that, while it was a new company under new ownership, it would continue in the same business as NDC. In fact, 75 percent of its customers were NDC customers.

Mid–America's motion presents a very narrow legal question, one that has not been decided by the Court of Appeals for the Seventh (as in inning stretch) Circuit: What are the parameters of the substantial continuity test for finding successor liability under CERCLA?

■ Successor corporations are subject to liability under CERCLA. *See, e.g., United States v. Mexico Feed and Seed Co.*, 980 F.2d 478 (8th Cir.1992). The determination of who is a successor corporation is governed by federal common law. *Mexico Feed.* The general rule regarding successor liability is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. *Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir.1977). There are four exceptions to the general rule:

Hodges, Duke Snider, and Junior Gilliam plus a 23-year-old southpaw, Sandy Koufax.

2. In September of 1970, the Milwaukee Brewers were drawing the curtain on their maiden campaign in Milwaukee. Despite the fact that they finished 65–97, 33 games out of the race, baseball was back in town and Milwaukee fans were loving it.

3. The year 1975 brought us one of the greatest moments in World Series history. The sixth game of the Series, one of the greatest ever played, saw Boston's Bernie Carbo hit a three-run pinch hit homer which paved the way for Carlton Fisk's game winning round tripper in the bottom of the 12th. Red Sox joy faded, however, in game seven, when future Hall of Famer Joe Morgan's bloop single in the ninth gave the Cincinnati Reds the Series. The Red Sox didn't return to the big show again until 1986, and then Mookie Wilson's dribbler through the legs of Bill Buckner multiplied the Series sadness in Beantown.

4. April 8, 1975, was the one-year anniversary of Henry Aaron's historical 715th dinger which broke Babe Ruth's lifetime record of 714.

(1) the purchasing corporation expressly or impliedly agrees to assume the liability;

(2) the transaction amounts to a "de facto" consolidation or merger;

(3) the purchasing corporation is merely a continuation of the selling corporation; or

(4) the transaction was fraudulently entered into in order to escape liability.

*Leannais* at 439.

The parties agree that, under these general rules of successor liability, Mid–America should not be held responsible for the Hunt's cleanup. The parties also agree that under CERCLA a more expansive test of successor liability is often used: the "substantial continuity" test. This is where their agreement ends.

The disagreement between the parties can be described in at least two ways. Either they disagree about when the substantial continuity test is applicable, or they disagree about what exactly the test is. It amounts to the same thing: Does the test require that the successor corporation have knowledge of the predecessor's potential liability? The plaintiffs say it does not; Mid–America says it does.

■■■ A broadened test of successorship is used in situations in which public policy dictates that traditional notions of successor liability should be overridden. Environmental cleanup is one such situation; successor liability is justified by a showing that in substance, if not in form, the successor, not the public, is the one who should bear the burden of the cleanup. *See Mexico Feed.*

Circuits [5] which have considered the scope of the substantial continuity test have taken somewhat differing paths. In *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260

(1990), the Court of Appeals for the Ninth (as in bottom of the ninth inning) Circuit dodged the questions by stating that, even were they to adopt the continuing business enterprise exception, it would not be applicable under the facts of that case. The reason was two-fold: the successor did not have actual notice of the potential liability and, more importantly in the court's view, the successor did not continue the offending business activity.

The Court of Appeals for the Fourth (as in the baseball bar, the Fourth Base, located on Milwaukee's National Avenue) Circuit applied the substantial continuity test in a CERCLA case. The test involved the following factors:

(1) retention of the same employees;

(2) retention of the same supervisory personnel;

(3) retention of the same production facilities in the same location;

(4) production of the same product;

(5) retention of the same name;

(6) continuity of assets;

(7) continuity of general business operations; and

(8) whether the successor holds itself out as the continuation of the previous enterprise.

In addition, the court stated, "If the transfer to the new corporation was part of an effort to continue the business of the former corporation yet avoid its existing or potential state or federal environmental liability, of course that should be considered also." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (1992).

Finally, the Court of Appeals for the Eighth (as in "dial 8" [6]) Circuit in *Mexico Feed* used the substantial continuity test but declined to find that the new owner in that

---

**5.** As Mid–America's counsel correctly notes, federal judges acquire true wisdom only when they sit on (or are "elevated" to) courts of appeals. Therefore, I won't look to the Federal Supplement for any law on the issue. The lawyer who made this observation—Eric Klumb—it should be noted, is not to be confused with the legendary Elmer Klumpp who had three hits (and a .115 batting average) during a very forgettable major league career that ended with the Boston Braves in 1937.

**6.** "Dial 8" means to hit a home run. Why? Well, the term comes from hotels where, as we know, traveling ballplayers spend a lot of time. When they're in a hotel, and they want to make a long distance call, they "dial 8" on the hotel phone. Hitting a home run—sending the ball "long distance"—is called (probably only by witty baseball players) "dialing 8."

case was a successor. There were a number of reasons: the new owner was a larger, preexisting corporation, the buyout was an arm's-length transaction, the new owner had been a competitor of the potentially liable corporation, and "[i]n addition, ... [the new owner] had no actual notice. It had no knowledge of the offending tanks nor had [the former corporation] been identified as a potentially responsible party for CERCLA purposes...." At 489.

■ Knowledge of potential liability is a factor to be considered and, in fact, if there is knowledge of the liability, it seems likely that that factor will be very significant. However, I will not rule out the possibility that substantial continuity could be established without actual knowledge of potential liability. It is unnecessary in this case to make that decision. This is not a case in which Mid–America should be held responsible for NDC's liability.

■ Mid–America has established that it is not a successor corporation. Looking to the relevant considerations, I find that Mid–America engaged in a business much like that of NDC. There is no indication that the employees were different or that they did different jobs. Mid–America continued to service many NDC customers although it added a substantial number of new accounts. The ownership of the companies did not overlap. And, of course, Mid–America had no knowledge of the potential liability of NDC for the Hunt's Landfill cleanup. Furthermore, apparently, only one hauler links NDC with the landfill. Finally, for four years prior to the sale to Mid–America, NDC had itself not been using Hunt's Landfill. This is not a situation in which a sale was structured to avoid a fairly likely potential liability. Mid–America should be yanked out of this game and sent to the showers.

IT IS THEREFORE ORDERED that the motion of Mid–America for summary judg-ment is GRANTED; Mid–America is DIS-MISSED from the case.