**NORTH SHORE GAS COMPANY,**
Plaintiff,

v.

**SALOMON, INC., Defendant.**

No. 94 C 7250.

United States District Court,
N.D. Illinois.

May 5, 1997.

pertain to a different matter, and Burlington Northern does not disagree.

James H. Schink, Lise Taylor Spacapan, Diane Katharyne Moore, Kevin H. Rhodes, Kirkland & Ellis, Chicago, IL, Laurence A. Silverman, Robert M. Hallman, Cahill, Gordon & Reindel, New York City, for Plaintiff.

Richard John Kissel, Mary Beth Cyze, Roberta M. Saielli, Gardener, Carton & Douglas, Chicago, Laurence A. Silverman, Robert M. Hallman, Roberta G. Gordon, Cahill, Gordon & Reindel, New York City, John D. Faught, John Faught & Associates, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

This opinion supersedes the court's opinion in this case dated March 7, 1997.

Plaintiff North Shore Gas Company brings this action against defendant Salomon, Inc. pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, seeking a determination that it is not liable to defendant under CERCLA for response costs incurred and to be incurred in connection with remediating contamination from releases of hazardous substances at 1805 South Bannock Street, Denver, Colorado (the "Site"). This court has subject matter jurisdiction over this action pursuant to CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b). The parties have filed cross-motions for summary judgment. For the reasons set forth below, the court denies defendant's motion and grants plaintiff's motion for summary judgment.

## FACTS[1]

Plaintiff is an Illinois corporation with its principal place of business at 122 Michigan Ave, Chicago, Illinois. Plaintiff was incorporated in the early 1900's as a company that supplied gas to communities around Waukegan, Illinois. In 1916, plaintiff retained a "well-known consulting engineer," William A. Baehr, to solve its operating problems and to manage the company and its property. In 1922, Baehr formed a registered public utilities holding company, North Continent Utilities ("NCU"), that held plaintiff's common stock.

By 1926, plaintiff's existing gas production facilities were becoming obsolete and inadequate to satisfy the needs of plaintiff's customers. Thus, on January 17, 1927, Baehr incorporated North Shore Coke & Chemical Company ("NSC") to provide plaintiff's gas requirements. In 1928, NSC completed the construction of a coke oven plant in Waukegan and, thereafter, supplied the bulk of plaintiff's gas requirements (83–91%).

The management of plaintiff, NSC, and NCU was headed by Baehr, who was president of all three companies, which all had management services agreements with the William A. Baehr Organization, Inc. From 1927 to 1942, NCU held the majority of the common and preferred stock of NSC. By 1941, NCU owned all of plaintiff's outstanding common stock and approximately 2.28% of its preferred stock.

The S.W. Shattuck Chemical Company ("Old Shattuck") was incorporated in 1918 in Colorado. Old Shattuck's principal activity was mineral ore processing, including a mineral processing plant on the Site. In 1934, NSC purchased a 60% stock interest in Old Shattuck. On March 8, 1955, Denver Ice and Cold Storage merged with Old Shattuck, keeping the name S.W. Shattuck Chemical Co. In December 1969, Englehard Minerals purchased Old Shattuck, forming the S.W. Shattuck Chemical Co., Inc. ("Shattuck"). Thereafter, Shattuck became a wholly-owned

---

1. The facts are taken from the parties' Local Rule 12M and 12N statements and exhibits filed in support thereof.

subsidiary of defendant. In 1984, Shattuck closed the majority of its operations.

In the mid–1930's, NSC organized North Continent Mines ("NCM"). The business of NCM consisted principally of the mining and processing of ores containing vanadium and uranium. NCM carried out some of its operations in Colorado.

In the spring of 1941, plaintiff and NSC jointly filed a Plan of Reorganization (the "1941 Plan") under Section 11 of the Public Utility Holding Company Act of 1935. The principal features of the 1941 Plan were the transfer of the utility assets of NSC to plaintiff, the recapitalization of plaintiff, the settlement of all conflicting claims by interested parties, and the refunding of joint bonds issued by NSC and plaintiff. Non-utility assets (i.e. Old Shattuck and NCM) were transferred to NCU.

The Plan was approved by the Securities and Exchange Commission ("SEC") by order on November 13, 1941. The Illinois Commerce Commission ("ICC") also approved the 1941 Plan by order entered on November 5, 1941. After the reorganization, plaintiff operated the Waukegan coke plant and manufactured coke oven gas for its utility customers. On March 30, 1942, NSC liquidated.

In 1983, the Site was included on the National Priorities List because both radioactive and nonradioactive hazardous substances were found there. In 1992, the United States Environmental Protection Agency found that the S.W. Shattuck Chemical Company, Inc. ("Shattuck") was responsible for cleaning up the Site, and issued a CERCLA Section 106 Order (the "Order") compelling Shattuck to clean up the property. In a guarantee dated September 1, 1993, defendant guaranteed the performance of the Order by its wholly-owned subsidiary, Shattuck. For purposes of this action, defendant has also agreed to assume Shattucks liability.

John Faught ("Faught"), on behalf of Shattuck, sent plaintiff a letter dated January 31, 1994 (the "Faught Letter"), demanding reimbursement, indemnification, and contribution for Shattuck's CERCLA response costs at the Site. (Hereinafter "Shattuck" refers to Old Shattuck and Shattuck.) In the letter,

Faught asserts that, pursuant to the 1941 Plan, plaintiff is liable for the clean-up costs as the successor corporation to NSC. NSC allegedly owned and/or operated the Bannock Street Site at the time when hazardous substances were disposed of on the Site. In the demand letter, Faught quotes full paragraphs from the 1941 Plan. The Faught Letter also explains that Shattuck is a wholly owned subsidiary of defendant Salomon, and that defendant has provided financial assurance for the remediation.

After receiving the demand letter, the parties met to discuss the issues raised in the Faught Letter, but failed to resolve the dispute. Plaintiff was told that if it did not agree to share in the clean-up costs it would be sued for contribution. On December 5, 1994, plaintiff filed the instant declaratory judgment action asking this court to declare whether plaintiff is liable to defendant under CERCLA for response costs incurred and to be incurred, or any other damages in connection with the Site.

Defendant filed motions before this court on February 2, 1995, requesting the court to: (1) decline to exercise jurisdiction over the case pursuant to 28 U.S.C. § 2201; (2) dismiss plaintiff's action pursuant to Fed. R.Civ.P. 12(b)(7) and 19, for failure to join an indispensable party (Shattuck); or, in the alternative, (3) transfer venue of this action to the District Court for the District of Colorado, pursuant to 28 U.S.C. § 1404(a). In its opinion dated August 22, 1995, the court denied defendant's motion to decline declaratory judgment jurisdiction, its motion to dismiss, and its motion to transfer.

The parties have filed the instant cross-motions for summary judgment. Plaintiff argues that it did not succeed to any Shattuck liabilities under the 1941 Plan because: (1) plaintiff did not expressly or implicitly assume NSC's liabilities (if any) for Shattuck under the 1941 Plan; (2) plaintiff did not succeed to NSC's liabilities (if any) for Shattuck as a matter of law; and in any event, (3) NSC is not liable as either an "operator" or an "arranger" for Shattuck's liabilities under CERCLA. Defendant responds that: (1) plaintiff is a direct successor to NSC's liabilities under the 1941 Plan; (2) even if the 1941

Plan was an asset purchase, plaintiff succeeded to NSC's liabilities as a matter of law; (3) NSC is liable under CERCLA as both an operator and an arranger.

## DISCUSSION

### I. *Standard*

A court should grant summary judgment if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to identify portions of the pleadings, answers to interrogatories, and affidavits which demonstrate an absence of a genuine issue of material fact. *Id., Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). The simple assertion that a factual dispute exists is not enough to defeat a Rule 56(c) motion. To defeat a motion for summary judgment, the non-moving party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court must read the facts in a light most favorable to the non-moving party. *Id.*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

### II. *Successor Liability Under CERCLA*

In 1980, Congress enacted CERCLA to provide a comprehensive response to the wide-spread problem of hazardous waste disposal. *American National Can Co. v. Kerr Glass Manufacturing Corp.*, 1990 WL 125368, at *4 (Aug. 22, 1990 N.D.Ill..). The statute imposes the costs of environmental cleanup on the parties responsible for the contamination, shifting the burden away from the federal government and, consequently, away from federal taxpayers. *Id.* Potentially liable parties under CERCLA, 42 U.S.C. § 9613(f)(1), include:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of the disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

 Persons held liable under CERCLA may seek contribution from other potentially responsible persons. 42 U.S.C. § 9612(f).[2] Contribution may be sought under various theories of liability, including successor liability. *See Hunt's Generator Committee v. Babcock & Wilcox Co.*, 863 F.Supp. 879, 882 (E.D.Wis.1994); *American National Can*, 1990 WL 125368, at *5. Although the Seventh Circuit has not reviewed successor liability in the context of CERCLA, other circuits and district courts within the Seventh Circuit have concluded that successor liability applies to CERCLA cases. *United States v. Mexico Feed and Seed Co.*, 980 F.2d 478, 486 (8th Cir.1992); *Smith Land & Improvement Corp. v. Celotex*, 851 F.2d 86, 92 (3rd Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *Ninth Ave. Remedial Group v. Allis–Chalmers Corp.*, 195 B.R. 716, 722 (N.D.Ind.1996); *Hunt's Generator*, 863 F.Supp. at 882; *Gould v. Alter Metal Co.*, 1994 WL 406576, at * 2 (Aug. 1, 1994 N.D.Ill.1994); *Allied Corpora-*

2. Section 9613(f)(1) provides, in pertinent part:
Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a).... Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure and shall be governed by Federal law.

*tion v. Acme Solvents Reclaiming, Inc.*, 812 F.Supp. 124, 126 (N.D.Ill.1993). Most courts that have addressed the issue, including those in this circuit, have applied federal common law to the question of successor liability under CERCLA. *See Ninth Ave.,* 195 B.R. at 722 (citing cases); *Hunt's Generator,* 863 F.Supp. at 882; *American National Can,* 1990 WL 125368, at * 5 ("In the interest of maintaining national uniformity, federal law defines successor liability under CERCLA."). This court will follow suit.

▮▮▮▮ The general rule of successor liability is that a corporation that purchases only the assets of another corporation does not acquire the liabilities of the selling corporation. *Allied Corp.,* 812 F.Supp. at 126. See also *Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Tasemkin,* 59 F.3d 48, 49 (7th Cir.1995) (non-CERCLA case). There are four exceptions to this rule: (1) the purchaser explicitly or implicitly agrees to assume liability; (2) the transaction amounts to a de facto merger or consolidation; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction was fraudulently entered into in order to escape liability. *Allied Corp.,* 812 F.Supp. at 126.

In this case, defendant argues that: (1) NSC has incurred direct CERCLA liability as an operator and arranger for the operations of its subsidiaries, Shattuck and NCM; and (2) plaintiff is liable for contribution for NSC's direct CERCLA liabilities because plaintiff is the successor corporation of NSC. The court addresses the successor liability issue first. For purposes of its analysis on successor liability, the court assumes arguendo that NSC has incurred direct CERCLA liability as an operator and arranger for the operations of Shattuck and NCM.

The parties agree that the fourth exception to the doctrine of successor liability does not apply to the instant case. Defendant contends, nevertheless, and plaintiff disputes,

that plaintiff succeeded to NSC's alleged direct CERCLA liabilities under the first three exceptions to the doctrine of successor liability.

**A. Express/Implied Assumption of Liability**

▮▮▮ Defendant contends that plaintiff expressly or implicitly succeeded to all of NSC's liabilities, including the CERCLA liabilities of Shattuck and NCM, under the terms of the 1941 Plan. The parties do not dispute that Illinois law applies to the interpretation of the 1941 Plan. *See John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401, 405 (1st Cir.1993) (state contract law governs interpretation of agreements with respect to CERCLA liability). In contract interpretation, the overriding goal is to give effect to the expectations of the parties. *See GNB Inc. v. Gould, Inc.*, 1992 WL 277027, at *2 (Sept. 28, 1992 N.D.Ill.). To do so in the instant case, the court must look first to the terms of the 1941 Plan. *See Harrison v. Sears Roebuck & Co.*, 189 Ill.App.3d 980, 137 Ill.Dec. 494, 546 N.E.2d 248, *appeal denied,* 128 Ill.2d 663, 139 Ill.Dec. 512, 548 N.E.2d 1068 (1989). If the court determines that the terms are ambiguous as a matter of law, it may then examine extrinsic evidence in order to better define the parties' expectations. *Borys v. Rudd,* 207 Ill.App.3d 610, 152 Ill. Dec. 623, 627, 566 N.E.2d 310, 314 (1990), *appeal denied,* 139 Ill.2d 593, 159 Ill.Dec. 104, 575 N.E.2d 911 (1991).

▮▮▮ The pertinent passage in the 1941 Plan, as identified by both parties, is as follows:

> Immediately following the recapitalization of [plaintiff], [NSC] shall sell, transfer and assign to [plaintiff] all of its right, title and interest in and to its business, properties, and contract and other rights, of every kind and character, except as mentioned in Section 6(c) [excluding NSC's ownership interests in Shattuck and NCM][3] in ex-

---

**3.** Section 6 of the 1941 Plan states:
The Plan is designed -
(c) to vest in [plaintiff] all the right, title and interest of [NSC] in and to the business, properties, and contract and other rights, of every kind and character, of [NSC], other than the

indebtedness and the shares of capital stock of North Continent Mines, Inc. and of The S.W. Shattuck Chemical Company, hereinafter mentioned in Section 10, owned by [NSC], and other than the sum of $45,000 in cash which

change for 57,041 new Common Shares of [plaintiff]. [Plaintiff] *shall take said business,* properties and contract and other rights subject to all liens, claims, and charges thereon, and *shall assume liabilities and obligations of every kind and character* (other than the Debentures, and the interest thereon, hereinafter mentioned) of [NSC] *accrued to or existing on the date of transfer* .... (emphasis added).

■ Plaintiff argues that, under this provision, it assumed only the liabilities of the "said business" acquired, which, as stated in Section 6(c), did not include NSC's investment in Shattuck and NCM.[4] Defendant responds that "said business" does not apply to the phrase "shall assume liabilities and obligations of every kind and character." The latter phrase, defendant continues, represents an unqualified assumption of NSC's liabilities.

Based only on the cited provision, defendant's construction may appear reasonable. Yet, in interpreting the language at issue, the court should read the 1941 Plan in its entirety. *See GNB Battery Technologies, Inc. v. Gould, Inc.,* 65 F.3d 615, 621 (7th Cir.1995). Section 6(c), though it does not mention the liabilities of Shattuck or NCM, expressly excludes NSC's ownership interests in Shattuck and NCM from the assets being transferred to plaintiff pursuant to the 1941 Plan.

Those assets were transferred to NCU, plaintiffs and NSCs former parent.

Moreover, the relevant language in the 1941 Plan presents an extrinsic ambiguity: while it might appear to be clear on its face, it becomes ambiguous when placed in context of its real world application. *See GNB Inc. v. Gould, Inc.,* 1992 WL 277027, at *3 (Sept. 28, 1992 N.D.Ill.) (finding extrinsic ambiguity with language that successor corporation would "assume ... all ... liabilities ... relating to the businesses and operations" of predecessor corporation where successor did not acquire all of predecessor's facilities). As plaintiff forcefully argues, it defies logic that plaintiff would assume the liabilities of assets it had expressly excluded from the 1941 Plan. Further, plaintiff is, and has been since its inception, a public utility company—specifically, a gas company. Plaintiff has never been involved in the mining business, nor has it ever engaged in any activity on the Site found to be contaminated by Shattuck's operations. Indeed, one of the purposes of the 1941 Plan was to divest plaintiff, a public utility, of non-utility assets.

Extrinsic evidence, such the parties' own interpretations of the contract by their contemporaneous and subsequent conduct, is also persuasive to resolve ambiguities in the 1941 Plan. *Borys,* 152 Ill.Dec. at 627, 566 N.E.2d at 314. In support of their motions, both parties present hundreds of documents.

will be retained and disposed of by [NSC] as hereinafter provided in Section 10 ...

**4.** Relying on *John S. Boyd v. Boston Gas Co.,* 992 F.2d 401 (1st Cir.1993), plaintiff further argues that the "accrued or existing" language limits the liabilities it acquired to those in existence at the time that the 1941 Plan was executed. Plaintiff continues that, because CERCLA liability did not "exist" in 1941, the limiting language in the 1941 Plan precludes a finding of CERCLA liability. This court does not find this argument persuasive.

In *Boyd,* the First Circuit interpreted the contract at issue under Massachusetts law to find that the successor corporation had not agreed to assume future environmental liabilities. In contrast, applying Illinois rules of contract construction, the Seventh Circuit in *GNB Battery Technologies v. Gould, Inc.,* 65 F.3d 615, 622 (7th Cir. 1995), found that because the acts giving rise to CERCLA liability in that case had occurred at the time of the sale, and because the assumption agreement transferred liabilities "incurred" by the predecessor corporation at the time of the

sale, CERCLA liability was transferred. See *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 326 (7th Cir.1994)(district court erred in declining to interpret indemnity agreement as transferring CERCLA liability on grounds that CERCLA had not been enacted at time of contract); *American Can,* 1990 WL 125368, at *7 ("[CERCLA] liability is imposed retroactively, even though prior owners may not have known that someday they would be responsible for removing their hazardous waste."). Although the parties dispute the time period during which the Site became contaminated, it appears certain that at least some of the acts giving rise to Shattuck's CERCLA liability (and NSC's alleged direct CERCLA liability as an operator and arranger) had occurred by the time of the 1941 Plan. Therefore, the court finds that these acts had "accrued" or accumulated, at least in part, by 1941. Consequently, a transfer of CERCLA liability under the 1941 Plan is not precluded based on the "accrued or existing" limitation.

Several documents relate to defendant's acquisition of Shattuck and events before or after 1934 to 1942, the alleged time period that the contamination occurred. However, the bulk of the parties' exhibits are not relevant to the central issue in this case: whether plaintiff succeeded to or acquired NSC's alleged direct CERCLA liabilities as an operator and arranger for the operations of Shattuck and NCM as a result of the 1941 Plan or by operation of law. Defendant's assumption of Shattuck's liabilities is not at issue, nor are the specifics of Shattuck's mineral processing operations. As defendant concedes, the most relevant documents for the court's construction of the 1941 Plan are those which closely relate to the plan, such as the bill of sale transferring property from NSC to plaintiff, the findings and opinion on the 1941 Plan by the SEC, and the report by Duff & Phelps on NSC and plaintiff.

The bill of sale transferring NSC's property to plaintiff pursuant to the 1941 Plan sets forth the assets to be retained by NSC, namely:

(a) The shares of capital stock of [NCM] and [Old Shattuck], owned by [NSC];

(b) The sum of $45,000 in cash;

(c) The indebtness owed by [NCM] to [NSC], amounting at July 31, 1941, to $233,756.62, and the indebtness owed by [Old Shattuck] to [NSC], amounting at July 31, 1941, to $109,622.42.

The bill of sale does not state that NSC retained the liabilities associated with the aforementioned assets. Defendant argues that plaintiff must have succeeded to all of *NSC's* liabilities, since they could not have "simply ... evaporated." The court, however, declines to make the negative inference. As both parties' exhibits demonstrate, NCU succeeded to *NSC's* investments in Shattuck and NCM. *See, e.g., In the Matter of North Shore Gas Co., North Shore Coke & Chemical Co., North Continent Utilities Corp.,* File No. 54–32, Securities and Exchange Commission, November 19, 1941, at 10. Therefore, it appears that NCU succeeded to the accompanying liabilities.[5]

The SEC's opinion dated November 19, 1941, is also relevant.

It states, in part:

Immediately following the recapitalization of [plaintiff], [NSC] will sell to [plaintiff] all its assets subject to its liabilities, with the exception of $45,000. in cash and its investment in two non-utility subsidiaries, in exchange for 57,041 new common shares of [plaintiff]

While not a model of clarity, this passage suggests that the SEC interpreted the exclusion of NSC's investment in Shattuck and NCM in the 1941 Plan to include the liabilities associated with those investments.

Additionally, the court considers the August 1, 1940, report by Duff & Phelps on the businesses and operations of NSC and plaintiff, a report relied upon by both plaintiff and defendant in their briefs. Discussing NSC's investment in Shattuck and NCM with respect to plaintiff's proposed acquisition of NSC's assets, the report states, "It is our opinion, however, that investments of this type have no place in a public utility situation, and we would prefer to see them disposed of ultimately when the proper opportunity presents itself." These statements support plaintiff's argument that, as a public utility company, it did not intend to acquire all of NSC's business under the 1941 Plan, particularly not the assets or liabilities of NSC's business in non-utility operations.

Defendant disagrees with the reasoning that plaintiff did not intend to acquire the liabilities associated with NSC's shares of Shattuck and NCM because plaintiff did not acquire those investments. To support its argument, defendant relies heavily on the Seventh Circuit's opinion in *GNB Battery Technologies, Inc. v. Gould, Inc.,* 65 F.3d 615 (7th Cir.1995). In that case, GNB, the successor corporation, acquired several battery plants from Gould, the predecessor corporation, in 1983. Six years after the closing of the Gould–GNB transaction, various environmental problems relating to the battery business surfaced, and CERCLA liability was found. *Id.* at 618. GNB agreed to indemni-

---

5. The court notes that whether NCU succeeded to the liabilities of Shattuck and NCM is irrele-

vant to the court's analysis on plaintiff's successor liability.

fy Gould for any environmental liability deriving from the toxic waste stored at any facility GNB had acquired. GNB refused, however, to indemnify Gould for environmental liabilities occurring prior to the 1983 sale or for environmental damage to battery facilities that GNB did not purchase. *Id.*

The Seventh Circuit rejected GNB's argument that the assumption agreement encompassed only prospective CERCLA liabilities relating to the particular battery plants and assets conveyed by Gould in the bill of sale, and affirmed the district court's decision. *Id.* at 624. The district court's ruling that GNB intended to assume the disputed liabilities rested, in part, on a finding that GNB had been placed on notice of the potential environmental liabilities. *Id.* at 624. *See also GNB Inc. v. Gould,* 1994 WL 110210, at *3 (March 25, 1994 N.D.Ill.) ("[A]t the time of the execution of this agreement, it is essentially uncontroverted that both Gould and GNB Acquisition personnel knew of RCRA and CERCLA and that Gould may have had substantial liability under both statutes."), *aff'd,* 65 F.3d 615 (1995). The Seventh Circuit concurred, finding that, "[i]t is difficult to conclude that GNB was not aware of Gould's desire to transfer all liabilities, or that GNB actually believed that it was not assuming all the environmental liabilities, contingent or not, that derived from Gould's 70+ years of battery operations." *Id.* at 623.

Notwithstanding defendant's arguments, the court finds that the instant case is distinguishable from *GNB Battery.* There is no suggestion by either party that in 1941 plaintiff or defendant knew or contemplated the scope of environmental liability that could result from Shattuck's operations at the Site. Although, as defendant points out, several of plaintiffs and Shattucks officers overlapped, the court declines to find this fact to be controlling on the question of plaintiff's intent. Plaintiff's officers may have known of Shattuck's operations, but this is not the sort of knowledge of potential environmental liability found by the court in *GNB Battery.*

More significantly, GNB assumed part, though not all, of Gould's battery business and facilities. In the instant case, plaintiff is a public utility company in the gas business, and has never been involved or associated itself with the mining or mineral processing business, not to mention Shattuck's ore processing operations. Accordingly, based on the 1941 Plan and relevant parol evidence, the court finds that the 1941 Plan was an asset purchase by which plaintiff did not expressly or implicitly succeed to NSC's alleged direct CERCLA liabilities resulting from the operations of Shattuck and NCM.

**B. *De Facto Merger***

 Defendant argues that, even if the court finds that the 1941 Plan was an asset purchase only, the plan amounts to a de facto merger. A de facto merger occurs when one corporation is absorbed into another, but the precise statutory requirements for a merger are not met. *Gould v. Alter Metal Co.,* 1994 WL 406576, at *2 (N.D.Ill.1994). The effect of a de facto merger is that the surviving corporation is liable for the claims against the predecessor corporation. *Allied Corp.,* 812 F.Supp. at 127.

 Courts consider several factors in determining whether a de facto merger has occurred:

(1) there is a continuation of the enterprise of the seller in terms of continuity of management, personnel, physical location, assets, and operations;

(2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the corporation so that they become a constituent part of the purchasing corporation;

(3) the seller ceases operations, liquidates, and dissolves as soon as legally and practically possible; and

(4) the purchasing corporation assumes the obligations of the seller necessary for uninterrupted continuation of business operations.

*Allied Corp.,* 812 F.Supp. at 127 (citing *Louisiana–Pacific Corp. v. Asarco, Inc.,* 909 F.2d 1260, 1264 (9th Cir.1990)). *See also Gould,* 1994 WL 406576, at *2; *American Nat'l Can,* 1990 WL 125368, at *7.

In the instant case, there is evidence to support some of the requirements of a de facto merger. First, there was partial continuity of NSC's enterprise in terms of physical location, assets, and operations of NSC's business. Specifically, plaintiff acquired the majority of *NSC's* assets and, after the 1941 Plan, operated NSC's coke plant in Waukegan.[6] Second, there is a continuity of some of NSC's shareholders in that plaintiff purchased NSC's shares with its own stock. Third, NSC liquidated soon after the 1941 Plan.

However, by no stretch of the record is the fourth criteria for a de facto merger satisfied. While plaintiff assumed the obligations of the coke plant in Waukegan and NSC's related operations, it never assumed any obligations of Shattuck or NCM, relating or not to the Site. As Judge Conlon explained in *American Nat'l Can,* 1990 WL 125368, at *7:

> [I]n order to accomplish a de facto merger, the successor must continue the same enterprise as its predecessor. Ostensibly, CERCLA liability arises because the enterprise was involved in inadequate disposal of hazardous waste. Since the predecessor necessarily dissolves as a result of the merger, only the successor remains to accept responsibility for the predecessor's environmental misuse.

The court notes that the de facto merger doctrine is an equitable doctrine, and finds that equity would not warrant a finding of a de facto merger in the instant case. Plaintiff was not involved with the same business or operations as the entity (Shattuck) found liable for environmental damage to the Site. Without more, the court finds that the 1941 Plan was not a de facto merger and, therefore, does not subject plaintiff to *NSC's* alleged direct CERCLA liabilities as an operator or arranger for the operations of Shattuck or NCM on that basis.

**6.** The court rejects defendant's argument that NSC and plaintiff were, in effect, one business entity before the 1941 Plan. The documents submitted by both parties clearly demonstrate that

### C. *Mere Continuation*

Defendant's third argument is that plaintiff succeeded to all of NSC's liabilities, including those resulting from the operations of Shattuck and NCM, on the theory that after the 1941 Plan, plaintiff's business was a "mere continuation" of *NSC's* business. There are two versions of the "continuation" of business exception to successor liability: "mere continuation" and "substantial continuation." *Allied Corp.,* 812 F.Supp. at 129. The latter is a more expansive theory of liability, often used in CERCLA cases "where public policy dictates that the traditional notions of successor liability should be broadened." *Ninth Ave.,* 195 B.R. at 724; *Hunt's Generator,* 863 F.Supp. at 883. Although defendant's argument is based only on the former theory, the court finds that the latter theory is instructive on the policy reasons behind the "continuation of business" exception.

To find successor liability under the "mere continuation" theory, the court looks to the "identity of officers, directors, and stock between the selling and purchasing corporations." *Allied Corp.,* 812 F.Supp. at 129. Further, the court considers the continuity of investors and control and the adequacy of consideration in the transfer of assets. *Id.* The court should nonetheless, as defendant acknowledges, take a common-sense, rather than a mathematical, approach to the issue. *See HRW Systems, Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 330 (D.Md.1993).

The record is clear that the officers and directors of *NSC* and plaintiff after the 1941 Plan were not completely identical. Also, while the 1941 Plan involved a stock purchase that maintained the identity of common stockholders between NSC and plaintiff (some of plaintiff's stock was transferred to *NSC's* former stockholders), the evidence demonstrates that plaintiff's ownership distribution changed after the 1941 Plan. In particular, NCU, which had owned all of plaintiff's outstanding common and substan-

the two entities were separate companies, incorporated in different states, prior to the 1941 Plan.

tially all of its voting stock prior to the 1941 Plan, owned only 35% of plaintiff's voting stock after the 1941 Plan.

Defendant emphasizes that NCU maintained control over plaintiff by a cumulative voting system. This factor, while noteworthy, does not overcome the fact that there was no continuity of ownership of plaintiffs stock after the Plan. In addition, defendant has made no showing of inadequacy of consideration.

Moreover, the court emphasizes that the successorship doctrine is based on equitable principles. *See Ninth Ave.*, 195 B.R. at 727. The court notes that a policy behind the "substantial continuity" exception, which has been interpreted as being broader than the "mere continuation" exception, is to prevent a successor corporation from structuring a sale to avoid potential environmental liabilities. *Hunt's Generator*, 863 F.Supp. at 884. Neither this policy nor general notions of equity would be served in the instant case by imposing successorship liability on plaintiff for NSC's alleged direct CERCLA liabilities under the "mere continuation" doctrine, because the parties agree that the 1941 Plan was not structured to avoid environmental liability. To the contrary, the Plan had as one of its primary purposes the divesture by plaintiff of the non-utility assets that are responsible for the environmental liability.

Finally, the court's decision is consistent with Congress' broad policy in drafting CERCLA to spread the costs of hazardous waste cleanup among the parties responsible for the contamination. *Purolator Products Corp. v. Allied–Signal, Inc.*, 772 F.Supp. 124, 134 (W.D.N.Y.1991). While CERCLA permits parties to allocate liability amongst themselves by agreement, the court may consider public policy in interpreting such agreements. *Id.* ("Congress' intention to promote the spreading and equitable allocation of costs serves as a useful guide in applying the agreement to CERCLA liability, particularly since the parties themselves did not expressly address the issue in the agreement.") There is no evidence that plaintiff ever operated any business on the Site, and the public will not bear the brunt of the Site's environmental cleanup costs. The EPA has determined that Shattuck is liable for contamination on the Site, and defendant, as Shattuck's parent, has agreed to assume the financial obligations for the cleanup.[7]

---

7. Defendants argues that there is another exception to the rule that liability does not automatically transfer to an asset purchaser. Citing cases addressing successor liability in a context other than CERCLA, defendant contends that successor liability attaches in an asset sale if the "sale" is simply a corporate reorganization, which leaves real ownership unchanged. *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1424 (7th Cir.1993). Further, defendant relies heavily on Fletcher's treatise to differentiate between voluntary and involuntary reorganizations, contending that the former implies succession of liabilities. *See* 15 W. Fletcher, *Cyclopedia Corporations*, §§ 7201–01, at 549–55 (discussing concept of reorganization as distinguished from other corporate transactions and combinations). Defendant argues that the 1941 "Reorganization Plan" was a voluntary reorganization pursuant to which plaintiff succeeded to all of NSC's liabilities, including those of Shattuck and NCM. Plaintiff responds that the 1941 Plan was neither "voluntary" (as the SEC had pushed them to realign their voting stock) nor a "reorganization" in the sense of leaving real ownership unchanged.

In *Chicago Truck Drivers, Helpers and Warehouse Workers Union Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir.1995) (not a CERCLA case), the Seventh Circuit recognized exceptions to the no-liability rule for asset purchases: the successor corporation will assume liability "if the 'sale' is merely a merger *or some other type* of corporate reorganization that leaves real ownership unchanged." (Emphasis added). The *Tasemkin* court did not hold that all corporate restructurings or reorganizations result in successor liability. Moreover, in *Ninth Ave.*, 195 B.R. at 721, the court, citing *Tasemkin*, concluded that the four generally recognized exceptions to successor liability all fall under the rubric of "corporate reorganizations that ... leave the real ownership unchanged."

Whether there is a separate exception for "voluntary reorganizations" to the general rule of successor liability in CERCLA cases may be simply an academic point. Yet, even assuming such an exception exists, it would be inapplicable to the facts in this case. The categorization of "voluntary" or "involuntary" is not dispositive because, based on the record before it, the court finds that the 1941 Plan was not a "reorganization" in the sense of leaving ownership unchanged. Prior to the 1941 Plan, NCU owned 100% of the common stock of plaintiff. After the plan was implemented, NCU owned only 35% of plaintiff's common stock.

Accordingly, the court finds that plaintiff did not succeed to NSC's alleged direct CERCLA liabilities resulting from NSCs ownership and/or control of Shattuck and NCM. Plaintiff's motion for summary judgment is granted.[8]

## CONCLUSION

For the reasons set forth above, the court denies defendant's motion for summary judgment and grants plaintiff's motion for summary judgment.

8. Because the court finds that plaintiff is not a successor to any alleged direct CERCLA liabilities NSC might have incurred as an operator and arranger based on NSCs control of Shattuck and NCM, it need not address whether NSC actually incurred such CERCLA liabilities.